LOCAL FINANCE COMPANY OF ROCKLAND *vs.* MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION.

Plymouth. November 6, 1968. — December 3, 1968.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, & SPIEGEL, JJ.

*Anti-Discrimination Law. Words,* "Place of public accommodation."

An office maintained by a loan company and kept open during usual business hours to applicants for loans, each of whom was usually interviewed and assisted by an employee of the company, in the circumstances was a "place of public accommodation" within that term in G. L. c. 272, §§ 92A and 98, as amended; the prohibition of certain discriminatory practices in the issuance of surety bonds and in the granting of mortgage loans in c. 151B, § 4, subsections 3A and 3B, did not imply any limit on the application of c. 272, §§ 92A and 98. [15]

Substantial evidence before the Massachusetts Commission Against Discrimination warranted conclusions by the commission that, at an office of a loan company constituting a "place of public accommodation" within G. L. c. 272, § 98, the company's use on its loan applica-

355 Mass. 10                                                                11

Local Finance Co. *v.* Massachusetts Commn. Against Discrimination.

tions and ledger cards of boxes for checking whether an applicant was of white, negro, or Spanish ancestry was for the purpose of recording the applicant's race and was not solely for identification purposes as contended by the company, that the use of the boxes constituted a "distinction on account of color" and discrimination in violation of § 98, that on at least one occasion the company had declined to consider an application by a Negro for a loan because of his color, and that an appropriate desist order should be issued against the company.  [16]

PETITION filed in the Superior Court on August 27, 1964.

The case was reported by *Murray*, J., without decision.

*J. Barry Morrissey* for the petitioner.

*James J. O'Leary*, Deputy Assistant Attorney General, for the respondent.

CUTTER, J.  This is a petition under G. L. c. 30A, § 14, as amended, to review a decision of· the Commission Against Discrimination (the commission).  Upon the record before the commission, it has been reported without decision by a judge of the Superior Court.

Local Finance Company of Rockland (Finance) is a trust or voluntary association.  See G. L. c. 182, as amended. It holds a license to make loans (see G. L. c. 140, §§ 96–114A, as amended) and maintains an office in Rockland, open during usual business hours to applicants for loans.  Each applicant usually is interviewed by an employee of Finance and by him is assisted in filling out an application form.

The form contains three "boxes" marked, respectively, 1, 2, and 3.  If the applicant is white, box 1 is checked; if the applicant is a Negro, box 2 is checked; and if the applicant is of Spanish ancestry, box 3 is checked.  Finance's ledger cards contain similar boxes used for the same purpose.

The commission issued a complaint against Finance.  It alleged "discriminatory practices [on 15 April, 1964] in violation of" G. L. c. 272, § 98, as amended, by Finance, in that it maintained "an unlawful discriminatory policy of denying equal treatment in a place of public accommodation because of . . . [the] color . . . of applicants for loan and in using a code to distinguish applicants by . . . color." Finance claimed by its answer before the commission that it

was not subject to § 98. It filed a motion to dismiss the complaint.

On July 9, 1964, the commission conducted a hearing. Thereafter it made findings of the facts stated above concerning Finance and its practices. It found also (a) that "the information contained in the . . . boxes on . . . [Finance's] application is a factor which is considered by . . . [Finance] in determining whether to grant . . . a loan, white applicants being more favorably considered than are Negro or Spanish applicants," and (b) that on April 7, 1964, Finance's "general manager . . . refused to consider the application for a loan of a person solely because that person was not white."

The commission concluded (1) that Finance "is a place of public accommodation within the meaning" of G. L. c. 272, §§ 92A and 98; (2) that Finance's use of the boxes "on its applications and ledger cards . . . constitutes a distinction on account of color . . . in violation of" § 98; (3) that "giving consideration to the color" of the applicant constitutes discrimination; and (4) that Finance's refusal to consider an application on April 7, 1964, was a discrimination in violation of § 98. The commission's order required Finance to desist "from considering the color . . . of any applicant . . . as a factor in determining whether to grant . . . a loan," from "recording the color" of any applicant, and from using forms designed to record the color of applicants.

1. Finance contends that its place of business is not a "place of public accommodation" within §§ 92A and 98.[1]

---

[1] General Laws c. 272, § 98 (as amended through St. 1963, c. 613, § 5; see St. 1950, c. 479, § 3), reads, in part: "Whoever makes any . . . discrimination . . . on account of . . . color . . . except for good cause applicable alike to all persons of every . . . color . . . relative to the admission of any person to, or his treatment in, any place of public accommodation, resort or amusement, as defined in . . . [c. 272, § 92A] or whoever aids . . . such . . . discrimination . . . shall be punished . . . . All persons shall have the right to the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation, resort or amusement, subject only to the conditions and limitations established by law and applicable alike to all persons. This right is recognized and declared to be a civil right." In § 92A (as amended through St. 1953, c. 437), "place of public accommodation" is defined as including "*any place, whether licensed or*

When § 92A was first enacted by St. 1933, c. 117, "place of public accommodation" was a narrowly defined term, restricted essentially to inns, eating and recreation facilities, conveyances, barber shops, and theatres. By St. 1953, c. 437, the scope of the term was materially broadened, especially by the inclusion of the words "any place . . . which is open to and accepts or solicits the patronage of the general public" (fn. 1, see italicized language in the quotation from § 92A).[2] The italicized language (fn. 1) in § 92A, particularly when read in the light of the obviously broad legislative purpose, strongly indicates that the enumerated specific examples of "places of public accommodation" do not restrict the preceding general statutory language or provide a basis for applying the principle of ejusdem generis.[3]

In interpreting § 92A, no prior Massachusetts case is conclusive. See *Bryant* v. *Rich's Grill*, 216 Mass. 344, 347 (which refers to an earlier form of statute, found in St. 1895,

---

*unlicensed, which is open to and accepts or solicits the patronage of the general public and, without limiting the generality of this definition,* whether or not it be (1) an inn . . . motel . . . or resort for . . . patrons seeking housing or lodging, food, drink, entertainment, health, recreation or rest; (2) a carrier, conveyance or elevator for the transportation of persons . . . and the . . . facilities appurtenant thereto; (3) a gas station, garage, retail store or establishment, including those dispensing personal services; (4) a restaurant, bar or eating place . . . ; (5) a rest room, barber shop, beauty parlor, bathhouse, seashore facilities or swimming pool; (6) a boardwalk or other public highway; (7) an auditorium, theatre . . . or hall . . . ; (8) a place of public amusement, recreation, sport, exercise or entertainment; (9) a public library, museum or planetarium; or (10) a hospital . . . operating for profit; provided, however, that no place shall be deemed to be a place of public accommodation . . . which is owned or operated by a club or institution whose . . . facilities . . . are available only to its members and their guests nor by any religious, racial or denominational institution . . . nor by any organization operated for charitable or educational purposes" (emphasis supplied).

[2] The legislative history of the 1953 amendment shows little more than that it was intended to bring about an "expansion of the definition of a place of public accommodation." See title of 1953 House Bill No. 1967; 1953 Senate Bill No. 720; 1953 Senate Journal, pp. 845, 921. For comments on recent forms of § 92A, see Fox, Discrimination and Antidiscrimination in Massachusetts Law, 44 B. U. L. Rev. 30, 60; Caldwell, State Public Accommodation Laws, 40 Wash. L. Rev. 841, 845–846; annotation, 87 A. L. R. 2d 120, 125, fn. 16. See also note, 74 Harv. L. Rev. 526, 565.

[3] Indeed, one of the enumerated examples of places of public accommodation (fn. 1) is a "retail store or establishment," a term of sufficiently broad import to give some confirmation of the breadth of the italicized introductory general language. It may be of significance that retail stores now enter into credit arrangements similar in substance to small loans made by Finance and comparable institutions.

14                                      355 Mass. 10

Local Finance Co. v. Massachusetts Commn. Against Discrimination.

c. 461, as prohibiting "in the most comprehensive terms . . . . any discrimination except for good cause, applicable alike to all persons of every color"); *Crawford* v. *Robert L. Kent, Inc.* 341 Mass. 125, 126 (weight placed upon the circumstance that a dance studio "was a business operated for profit" in holding it not within the exclusion of organizations operated for educational purposes, see fn. 1). See also *Massachusetts Commn. Against Discrimination* v. *Colangelo*, 344 Mass. 387, 395–396.

In other jurisdictions, the current tendency of the decisions (although, of course, dealing with statutory language by no means uniform) is to give antidiscrimination statutes, generally comparable to § 92A, a broad, inclusive interpretation. The decisions place no undue emphasis on either the principle of ejusdem generis or the rule that penal statutes must be interpreted strictly. See *Amos* v. *Prom, Inc.* 117 F. Supp. 615, 622–630 (N. D. Iowa); *Burks* v. *Poppy Constr. Co.* 57 Cal. 2d 463, 468–470 (somewhat broader statutory language); *Lee* v. *O'Hara*, 57 Cal. 2d 476, 478; *Lambert* v. *Mandel's of Cal.* 156 Cal. App. 2d 855, 856–857; *Darius* v. *Apostolos*, 68 Colo. 323, 326–328; *Sellers* v. *Philip's Barber Shop*, 46 N. J. 340, 344–348; *Evans* v. *Ross*, 57 N. J. Super. 223, 229–232; *Camp-of-the-Pines, Inc.* v. *New York Times Co.* 184 Misc. (N. Y.) 389, 399–401 (Supr. Ct.); *Hobson* v. *York Studios, Inc.* 208 Misc. (N. Y.) 888, 891–894 (Mun. Ct.); *Everett* v. *Harron*, 380 Pa. 123, 126–127. We think that similar principles of interpretation may properly be applied to the general language of § 92A.

A further contention by Finance must be considered. General Laws c. 151B, § 4, as amended, makes it an unlawful practice[4] to discriminate on grounds of color in issuing surety bonds (subsec. 3A, inserted by St. 1955, c. 274) or in granting mortgage loans (subsec. 3B, inserted by St. 1960, c. 163, § 2). Finance argues that these specific provisions in c. 151B

---

[4] Section 4 provides, "It shall be an unlawful practice: . . . 3A. For any person engaged in the insurance or bonding business, or his agent, to make any inquiry or record of any person seeking a bond or surety bond conditioned upon the faithful performance of his duties or to use any form of application, in connection with the furnishing of such bond, which seeks information rela-

tend to restrict the general language of c. 272, §§ 92A and 98, since subsecs. 3A and 3B (fn. 4) would not have been necessary if §§ 92A and 98 in fact covered the same area. This argument overlooks c. 151B, § 9 (most recently amended by St. 1965, c. 397, § 7), which provides that c. 151B "shall be construed liberally for the accomplishment of the purposes thereof" and that nothing in c. 151B "shall be deemed to repeal [c. 272, § 98] or any other law ⋮ . . . relating to discrimination because of . . . color." We perceive no indication of any legislative desire to have subsecs. 3A and 3B of c. 151B, § 4, limit c. 272, §§ 92A and 98.

In the circumstances, we interpret c. 272, § 92A, as amended, as including the business conducted by Finance within the term "place of public accommodation."

. 2. The commission was warranted by the evidence in finding the following facts. On the morning of April 7, 1964, John T. Murphy of the Seaview Garage in Marshfield called Finance's Rockland branch manager concerning a possible loan for one of Murphy's customers, Gracia by name. The branch manager inquired of Murphy whether the customer was "a Code 2," that is a Negro, and told Murphy that "he would not accept any application from a Negro." That afternoon Murphy went to Finance's office, where the application form was explained to him. Finance's branch manager then said "he had Negro [application] files in his files enough so as . . . no one could claim discrimination and they were all A–1 credit risks," and also "that he had told other people that if they didn't like the way he did business they could take him to the" commission. Later a commission field representative went to the Finance office where the use of the code was admitted and explained. The branch manager testified that Murphy's customer had the same or a similar name as "a poor account, a colored per-

tive to the race, color, religious creed, national origin or ancestry of the person to be bonded. 3B. For any person engaged in the business of granting mortgage loans to discriminate against any person in the granting of any mortgage loan, including but not limited to the interest rate, terms or duration of such mortgage loan, because of his race, color, religious creed, national origin, or ancestry."

son" in Finance's files, and that the code was used "strictly for identification purposes." The application form used by Finance showed the code "boxes" at the top of the front of the form. In the middle of the back of the form were spaces for recording such identification information as sex, social security number, driver's license number, employer's badge number, date of birth, union, and selective service data.

We think that this evidence was sufficiently substantial to permit the commission to conclude that the code "boxes" were used to record race and that Finance on at least one recent occasion had declined to consider a loan to a Negro on the ground of color. The commission reasonably, in the light of Murphy's testimony, could regard the concealment involved in Finance's use of a code as a suspicious circumstance, casting doubt on the truthfulness of its claim that it recorded color only for identification purposes. See Fuld, J. in *Holland* v. *Edwards*, 307 N. Y. 38, 45 ("One intent on violating the . . . [antidiscrimination law] cannot be expected to . . . announce his purpose. Far more likely is it that he will pursue his discriminatory practices in ways that are devious, by methods subtle and elusive").

3. Finance does not appear to contend that the commission's order was in any respect inappropriate, if Finance was subject to §§ 92A and 98. This slender record shows no occasion for modifying the remedial measures adopted by the commission in its discretion. See *Holland* v. *Edwards*, 307 N. Y. 38, 46. Cf. *Massachusetts Commn. Against Discrimination* v. *Colangelo*, 344 Mass. 387, 400–401, where it was noted that the order in that case seemed "particularly extreme in a case of first impression."

4. A decree, incorporating the substance of the commission's order and affirming it, is to be entered in the Superior Court.

*So ordered.*