# DECISIONS

## OF THE

## SUPREME JUDICIAL COURT

### OF

## MASSACHUSETTS

---

SOPHIE C. CURRIER[1] *vs.* NATIONAL BOARD OF MEDICAL EXAMINERS.

Norfolk. December 8, 2011. - April 13, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, & LENK, JJ.

*Civil Rights,* Availability of remedy, Coercion. *Equal Rights Act. Anti-Discrimination Law,* Sex, Public accommodation.

In a civil action arising from allegations by the plaintiff, a medical student, that the defendant, a private corporation responsible for administering a test required for medical licensure in Massachusetts, refused to give the plaintiff additional break time and a suitable environment during the test in which to express breast milk for her nursing infant, the judge properly granted summary judgment in favor of the defendant on the plaintiff's claim of violation of the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H and 11I, where, even assuming that the plaintiff possessed a constitutional right to express breast milk at any time, the defendant's

[1] Individually and on behalf of Lea M. Gallien-Currier, her daughter.

conduct (i.e., its offer to the plaintiff of a private room where she could express breast milk during the test, but its refusal to give her additional break time in which to do so) did not amount to coercion under that act. [11-14]

In a civil action arising from allegations by the plaintiff, a medical student, that the defendant, a private corporation responsible for administering a test required for medical licensure in Massachusetts, refused to give the plaintiff additional break time and a suitable environment during the test in which to express breast milk for her nursing infant, the judge erred in granting summary judgment in favor of the defendant on the plaintiff's claim under the Massachusetts Equal Rights Act, G. L. c. 93, § 102, where, given that the protections of that act extend to lactating mothers, the plaintiff's evidence (i.e., that the defendant made various exceptions to its accommodations policy for persons who did not have a disability) was sufficient to permit an inference of intentional discrimination. [14-17]

In a civil action arising from allegations by the plaintiff, a medical student, that the defendant, a private corporation responsible for administering a test required for medical licensure in Massachusetts, refused to give the plaintiff additional break time and a suitable environment during the test in which to express breast milk for her nursing infant, the plaintiff was entitled to summary judgment on her claim under the public accommodation statute, G. L. c. 272, §§ 92A and 98, where there was no merit to the defendant's contention that it was not a place of public accommodation; where the evidence demonstrated that a subclass, comprised only of women who are expressing breast milk (a sex-linked distinction), was denied advantages of adequate break time; and where the defendant did not sufficiently rebut the plaintiff's expert evidence concerning the amount of time need to express breast milk properly and the adverse medical consequences of not doing so. [17-21]

This court, having decided in favor of the plaintiff in a civil action on an available statutory ground, declined to reach the plaintiff's constitutional claim arising from the same allegations. [21-22]

CIVIL ACTION commenced in the Superior Court Department on September 6, 2007.

The case was heard by *Thomas A. Connors*, J., on motions for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

*Marisa L. Pizzi* for the plaintiff.

*Joseph F. Savage, Jr.* (*Suzanne Williams*, of Pennsylvania, with him) for the defendant.

The following submitted briefs for amici curiae:

*Gerald Calnen* for Academy of Breastfeeding Medicine.

*Robert A. Burgoyne*, of the District of Columbia, & *John D. Lawrence* for National Conference of Bar Examiners & others.

*Simone R. Liebman & Catherine C. Ziehl* for Massachusetts Commission Against Discrimination.

IRELAND, C.J. This case arose from a dispute between the plaintiff, Sophie C. Currier (Currier), a medical student and a nursing mother, and the defendant, the National Board of Medical Examiners (NBME), a private, nonprofit corporation[2] responsible for administering the United States medical licensing examination (exam), which is a test required for medical licensure in Massachusetts. Currier brought an action for declaratory relief seeking a determination that, by refusing to give her additional break time and a suitable environment during the exam in which to express breast milk for her nursing daughter, the NBME violated (1) her right to privacy guaranteed under arts. 1, 10, and 12 of the Massachusetts Declaration of Rights; (2) the Massachusetts Civil Rights Act (civil rights act), G. L. c. 12, §§ 11H, 11I; (3) the Massachusetts Equal Rights Act (equal rights act), G. L. c. 93, § 102; and (4) the Massachusetts public accommodation discrimination statute (public accommodation statute), G. L. c. 272, §§ 92A, 98. Currier also sought injunctive relief requiring the NBME to give her an additional sixty minutes of break time per test day and a private room with a power outlet in order to express her breast milk in privacy. In a counterclaim, the NBME sought a declaration that it is not a State actor and that its gender-neutral accommodations policy does not disparately impact female exam candidates. The parties filed cross motions for summary judgment. A Superior Court judge denied Currier's motion and allowed NBME's motion. Judgments entered dismissing Currier's complaint as well as NBME's counterclaim. Both parties filed notices of appeal. We granted Currier's application for direct appellate review and invited interested parties to submit briefs on the issues raised.

We conclude that, in refusing to provide additional break time to Currier during the exam, the NBME did not violate the civil rights act because its conduct did not amount to coercion under that act. The judge, therefore, properly granted summary judgment to the NBME on this claim. We further conclude that Currier proffered sufficient evidence to raise a genuine issue of

---

[2]The National Board of Medical Examiners (NBME) is incorporated in Washington, D.C., and has offices located in Philadelphia, Pennsylvania.

material fact as to whether the NBME violated her rights under
the equal rights act. Thus, summary judgment on that count is
inappropriate. Concerning Currier's claim under the public ac-
commodation statute, we reject the legal arguments advanced
by the NBME regarding the application of that statute to these
circumstances, and conclude that Currier is entitled to summary
judgment on that claim. Because Currier is entitled to statutory
relief under the public accommodation statute (and possibly
also under the equal rights act), we do not decide her constitu-
tional claim. See *Commonwealth* v. *Vega*, 449 Mass. 227, 234
(2007) ("we generally decline to reach constitutional questions
where, as here, there is a readily available statutory ground that
renders such a decision unnecessary"); *Commonwealth* v.
*Paasche*, 391 Mass. 18, 21 (1984) (we do "not decide con-
stitutional questions unless they must necessarily be reached").
Our decision in the context of the equal rights act and public ac-
commodation statute counts, that lactation is a sex-linked clas-
sification, recognizes that there remain barriers that prevent new
mothers from being able to breastfeed or express breast milk. We
take this opportunity to extend protection to lactating mothers in
the context of lengthy testing required for medical licensure.[3]

1. *Background.* The material, undisputed facts (unless other-
wise noted) are as follows. The board of registration in medicine
(board), the Commonwealth's licensing agency for physicians,
has promulgated regulations setting forth "substantive standards
governing the practice of medicine which will promote the
public health, welfare, and safety and inform physicians of the
[b]oard's expectations and requirements." 243 Code Mass. Regs.

___

[3]We acknowledge that, after the dispute arose in this case, the Legislature
enacted G. L. c. 111, § 221 (*a*) & (*c*), inserted by St. 2008, c. 466, which
prohibits any "person or entity, including a governmental entity" from restrict-
ing, harassing, or penalizing a mother who is breastfeeding her child "in any
public place or establishment or place which is open to and accepts or solicits
the patronage of the general public and where the mother and her child may
otherwise lawfully be present." This statute, however, protects only the act of
breastfeeding, not the expression of breast milk through means of a breast
pump. We also acknowledge that the Federal government recently has taken
measures to extend protection to breastfeeding mothers in the workplace. See
29 U.S.C. § 207 (Supp. IV 2010) (requiring covered employers to provide
breastfeeding employees with "reasonable break time" and private location
[other than a restroom] to express breast milk during the workday, for one
year after child's birth).

§ 2.01(1) (2010).[4] These regulations require any person seeking to obtain a full medical license to (a) have completed a minimum of two or more academic years at a legally chartered college or university; (b) have completed and attended four academic years of instruction in one or more legally chartered medical schools and have received the degree of doctor of medicine, or its equivalent; (c) submit to the board satisfactory proof of good moral character; (d) complete one year of certain postgraduate medical training; and (e) fulfil the examination requirements for licensure as provided in 243 Code Mass. Regs. § 2.02(2). 243 Code Mass. Regs. § 2.02(1) (1995). A person "may fulfill the examination requirements for licensure by submitting evidence of having achieved a score acceptable to the [b]oard" on the exam. 243 Code Mass. Regs. § 2.02(2) (1995).

The NBME is responsible for administering the exam, which is divided into three "steps" or examinations. The NBME's stated mission is "to protect the health of the public by providing a common, consistent, state-of-the-art system of assessment for health professionals." The exam is accepted as part of the process of medical licensure in all fifty States.

Step 2, clinical knowledge (step 2), is the second step of the exam. It is a computer-based test that assesses whether an examinee can apply medical knowledge, skills, and understanding of clinical science essential for the provision of patient care under supervision and includes emphasis on health promotion and disease prevention. Step 2 of the exam is offered five to six days per week, fifty weeks of the year, at approximately 300 domestic test centers operated by Prometric, a private third-party company. Examinees select a test center subject to the approval of Prometric.

Step 2 is comprised of approximately 370 multiple-choice questions contained within eight sixty-minute testing blocks. Under standard conditions, step 2 is administered on computers in one nine-hour testing session. Prior to answering the test questions, examinees have fifteen minutes to complete an introductory tutorial. Examinees taking step 2 are provided with forty-five minutes of break time over the course of the examination to

---

[4]We cite to the regulations in effect at the time of the judge's order on the parties' motions for summary judgment.

attend to personal needs such as eating, drinking, and using the restroom. Examinees are required to sign in and out of the testing room, and may use their allotted break time as they choose throughout the exam, provided that they take breaks only between blocks. Under the standard format, examinees take the step 2 exam in shared examination rooms into which they are not permitted to bring personal items.

The NBME is bound by the Americans with Disabilities Act (ADA) to provide reasonable testing accommodations to applicants with disabilities as defined under the ADA. Under the ADA, an individual is considered to have a "disability" if he or she has a physical or mental impairment that substantially limits one or more major life activities, has a record of such impairment, or is regarded as having such an impairment. 42 U.S.C. § 12102(2) (Supp. IV 2010). The NBME's policy is to grant accommodations only for persons with "ADA covered disabilities." Such accommodations include providing additional time to complete the exam, additional break time, large print or audio examinations, or assistance in recording answers. When an examinee has an impairment that the NBME deems to be temporary, it determines on a case-by-case basis whether the impairment nonetheless rises to the level of "ADA covered disability" warranting reasonable accommodation. Currier alleges (and has proffered evidence) that the NBME, contrary to its stated policy, has provided accommodations to examinees whose impairments did not constitute disabilities under the ADA, including temporary medical conditions.[5]

The NBME has a "personal item exception" to its policy

---

[5]For example, an examinee with a compression fracture was afforded additional break time despite the NBME's conclusion that the examinee did not have a permanent disability under the ADA. In granting the request, a reviewer noted that the only other option "would be to have [the examinee] postpone her testing until her condition has improved, but this would interfere with her academic progress." In another case, the NBME received a request for a two-day extra break examination from a foreign medical student who had pain in her right buttock, leg, and foot. The NBME noted that she did not have a disability under the ADA, but appeared to have granted the request as a "courtesy." We note that the record in this case is not fully developed as further discovery was stayed shortly after the NBME filed its motion for summary judgment.

concerning disabilities. Pursuant to this exception, individuals with a medical condition that is not a disability under the ADA may, on request and approval of the NBME, bring personal items, such as pillows or food, into the testing room. The NBME, however, does not alter the test format for an individual who has been granted a personal item exception.

The NBME sets the score required to pass the exam, grades the exam, and reports the results to the varying licensing authorities.[6] The NBME maintains, contrary to the allegations of Currier, that it does not establish the educational eligibility requirements to sit for the exam.

In June, 2007, Currier, then enrolled at Harvard Medical School, notified the NBME that she planned to take the step 2 exam in the fall of 2007 at a Prometric testing center in Brookline.[7] Because Currier previously had been diagnosed with dyslexia and attention deficit hyperactivity disorder (ADHD), recognized disabilities under the ADA, the NBME granted Currier's request to be provided with an additional testing day to complete the exam as well as a separate testing room in which to take the exam.[8] Currier also requested additional break time

---

[6]The NBME cites to 243 Code Mass. Regs. § 2.02(4)(b) (2008) in maintaining that the Commonwealth, and not the NBME, "sets [the] passing score requirements for applicants seeking licensure." That regulation, however, sets forth the requirement of a passing score of seventy-five for the step 3 exam, not the step 2 exam. The NBME had not rebutted the documentary evidence submitted by Currier indicating that the NBME establishes the passing score of seventy-five for the step 2 exam. Thus, we accept Currier's statement of fact on this issue as true for summary judgment purposes. See *Community Nat'l Bank* v. *Dawes*, 369 Mass. 550, 554 (1976), citing Mass. R. Civ. P. 56 (e), 365 Mass. 824 (1974) (once moving party sustains burden of proving absence of material issue of fact, opposing party may not rely on pleadings or general denials but rather must "set forth specific facts" to show genuine, triable issue).

[7]In her first amended complaint, Currier stated that she was scheduled to graduate from medical school in the fall of 2007 and had accepted a residency position at Massachusetts General Hospital. Further, to obtain her medical degree and to begin her residency position, Currier needed to pass the step 2 exam. Currier alleged that if she did not pass the exam, she "face[d] the loss of her residency position" and, "as a result, her career as a physician and researcher . . . will be delayed indefinitely." Such a delay, she further alleged, would "injure her professional reputation, ability to earn a living and to begin fulfilling her medical school scholarship obligations, and may lead to the loss of her clinical knowledge and skills."

[8]There is no dispute concerning the adequacy of these accommodations.

because she would be breastfeeding her then four to five month old daughter at the time of the test and maintained that she needed more break time, beyond the standard forty-five minutes of break time, to express breast milk properly. The NBME denied this request, responding that it only provides accommodations to examinees with disabilities as defined under the ADA, and that lactation and expressing breast milk are not covered disabilities thereunder.[9] After further correspondence, the NBME eventually granted Currier a private examination room with a power outlet within which she could express breast milk during the examination and permitted her to bring food, liquids, and multiple assembled breast pumps into the private room. Pursuant to this offer, the NBME stated that Currier would have one hour of break time to use to express breast milk if she skipped the fifteen-minute tutorial on the first day of the exam and added that to the standard break time, and that on day two, by pumping for no more than twenty minutes during one break and no more than twenty-five minutes during the second break. Currier rejected this offer.[10] Currier contends that extra break time, beyond the standard forty-five minutes, is required in order for her to express breast milk properly.

In support of her contention, Currier submitted the affidavits of two individuals in the medical field: a medical doctor in the field of maternal-fetal medicine at Brigham and Women's Hospital in Boston, and a registered nurse and international board-certified lactation consultant. The affidavits set forth the following. The American Academy of Pediatrics, the American College of Obstetricians and Gynecologists, the Academy of Breastfeeding Medicine, and the American Academy of Family Practice recommend that an infant be exclusively breastfed for the first six months after birth and partially breastfed for up to at least twelve months of age. It is well established in the fields of medicine and public health that breastfeeding improves infants'

[9]The parties do not dispute that lactation and breastfeeding do not qualify as disabilities under the Americans with Disabilities Act (ADA).

[10]Currier's counsel explained by letter to the NBME that the proposed schedules and accommodations offered by the NBME were "unrealistic, inhumane, and inconsistent with [Currier's] experts' opinions as to the time required" to express breast milk and tend to her other personal needs (such as using the restroom) during the exam.

general health, growth, and development, and significantly decreases the risk of numerous acute and chronic diseases. There are also significant long-term and short-term maternal health benefits to nursing, including helping mothers accelerate pregnancy-related weight loss and reducing the risks of breast and ovarian cancer, as well as osteoporosis. The public health benefits of breastfeeding also include decreased health care costs due to reductions in infant morbidity.

A nursing mother of a four month old infant should express breast milk a minimum of every three hours to maintain milk production and avoid engorgement, blockage of milk ducts, galactoceles (milk retention cysts), mastitis (an infection of the breast caused by the blocked milk ducts), and breast abscesses. Incomplete expression of breast milk may also lead to blocked milk ducts, galactoceles, and mastitis. These conditions can be painful and potentially require medical and surgical intervention.

When not nursing directly, electric breast pumps, which require the use of a wall outlet or battery pack for operation, are among the most efficient means by which to express breast milk. To express breast milk properly using a hospital-grade breast pump, a nursing mother will require up to thirty minutes per pumping session.[11]

Use of a breast pump requires a private location because all such pumps require a woman to expose her breasts in order to position the equipment properly during the pumping process. It is not recommended that a restroom be used for expressing milk due to the risk of infection. Once pumping is complete, a nursing mother's hands should be cleaned in order to maintain proper hygiene.

Nursing mothers should consume an additional 500 calories and twenty-three ounces of liquids per day to maintain an adequate milk supply. Consequently, nursing mothers require

---

[11]Both of Currier's experts approximate a time frame of "twenty-five to thirty minutes" per pumping session to express breast milk properly using an electric breast pump. One expert breaks down this time as follows: three to five minutes for pump assembly, ten to twelve minutes to express milk, and five to ten minutes "to disassemble and clean the pump and to store or dispose of the expressed milk." The other expert agrees with the above estimates with the exception of the time needed to express the breast milk, which she estimates differently as between ten to fifteen minutes.

regular trips to a restroom. Although it is possible to eat and drink while expressing milk using a breast pump, it is not recommended because it requires the mother to configure a chair, table, and breast pump so that she can balance the pump flanges while eating. Forty-five minutes is an insufficient amount of time for a nursing mother of a four month old infant to eat, drink, use the restroom, and to express breast milk fully and properly using an electric pump two times over the course of eight hours.[12]

In September, 2007, Currier filed this action against the NBME. After a Superior Court judge denied her motion for a preliminary injunction, Currier sought interlocutory relief pursuant to G. L. c. 231, § 118, first par. A single justice of the Appeals Court vacated the order denying Currier's request for a preliminary injunction and entered a preliminary injunction requiring the NBME (1) to afford Currier an additional sixty minutes of break time per test day and (2) to provide her with a private room with a power outlet at the testing center so she could express breast milk. The NBME sought relief from this order by filing a petition pursuant to G. L. c. 211, § 3, with a single justice in the county court, which was denied. The NBME then appealed from the order of the single justice of the Appeals Court to a full panel of the Appeals Court pursuant to G. L. c. 231, § 118, second par. In a memorandum and order dated October 5, 2007, the Appeals Court affirmed the issuance of the preliminary injunction.

On October 10 and 11, 2007, Currier took the step 2 exam in a private room with the additional one hour of break time per test day as she had sought and had been ordered. Currier applied to take the exam again about one year later (presumably she did not initially attain a passing score). On this occasion, Currier requested and was granted an additional day to take the exam because of her dyslexia and ADHD, but she did not request additional time or any accommodations in order to express breast milk. On November 28, 2008, Currier received a passing score on the step 2 exam.

---

[12]The NBME did not refute the affidavits with supporting and opposing affidavits as required under rule 56 (e). Consequently, the NBME has not raised a genuine issue for trial concerning the facts referenced above in the affidavits. See *Community Nat'l Bank* v. *Dawes*, 369 Mass. 550, 554 (1976); note 6, *supra*.

In January, 2010, the parties filed their cross motions for summary judgment. As an initial matter, the judge, after noting that the case was technically moot, exercised his discretion to decide the case because the issues had been fully briefed; the issues were likely to arise again, yet evade appellate review; and the issues were of public importance. See *Ott* v. *Boston Edison Co.*, 413 Mass. 680, 683 (1992); *Lockhart* v. *Attorney Gen.*, 390 Mass. 780, 782-783 (1984). Turning to the merits of the case, the judge concluded that, even if Currier had a fundamental right to express breast milk, her State constitutional claims were barred because the NBME is not a State actor. Concerning Currier's claims of statutory violations, the judge determined that the NBME's failure to provide additional break time to Currier during the exam did not violate State law. Accordingly, the judge denied Currier's motion for summary judgment and allowed the NBME's motion for summary judgment.

2. *Standard of review.* " 'The standard of review of a grant of summary judgment is whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to a judgment as a matter of law.' . . . 'An order granting or denying summary judgment will be upheld if the trial judge ruled on undisputed material facts and his ruling was correct as a matter of law.' " *Greater Lawrence Sanitary Dist.* v. *North Andover*, 439 Mass. 16, 20-21 (2003), quoting *Augat, Inc.* v. *Liberty Mut. Ins. Co.*, 410 Mass. 117, 120 (1991), and *Commonwealth* v. *One 1987 Mercury Cougar Auto.*, 413 Mass. 534, 536 (1992). "A court must deny a motion for summary judgment if, viewing the evidence in the light most favorable to the nonmoving party, there exist genuine issues of material fact . . . ." *Golub* v. *Milpo, Inc.*, 402 Mass. 397, 400 (1988). See Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974).

3. *Civil rights act.* Currier argues that the NBME's decision not to provide her with additional break time to express breast milk violated the civil rights act. The civil rights act creates remedies for "[a]ny person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered

with [by any person, whether or not acting under color of law, by threats, intimidation or coercion]." G. L. c. 12, § 11I, citing G. L. c. 12, § 11H. To prevail, a plaintiff must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted to be interfered with; and (3) such interference was by threats, intimidation, or coercion. *Buster* v. *George W. Moore, Inc.*, 438 Mass. 635, 644 (2003). Here, Currier does not assert that the NBME subjected her to threats or intimidation. Rather, she contends that the NBME's decision not to afford her additional break time to express breast milk amounted to economic coercion because it forced her to abandon her right to express breast milk or "assume the risk of failing or not taking [the exam]," which would stunt her career because passing the exam is required in order for her to graduate from medical school and commence her residency.

Although "entitled to liberal construction of its terms," *Batchelder* v. *Allied Stores Corp.*, 393 Mass. 819, 822 (1985), the civil rights act "was not intended to create, nor may it be construed to establish a 'vast constitutional tort.' " *Buster* v. *George W. Moore, Inc.*, *supra* at 645, quoting *Bell* v. *Mazza*, 394 Mass. 176, 182 (1985). It is for this reason that the Legislature "explicitly limited the [civil rights act's] remedy to situations where the derogation of secured rights occurs by threats, intimidation or coercion." *Buster* v. *George W. Moore, Inc.*, *supra* at 646, quoting *Bally* v. *Northeastern Univ.*, 403 Mass. 713, 718 (1989).

As noted in *Buster* v. *George W. Moore, Inc.*, *supra*, the civil rights act "does not define actionable 'coercion.' " On numerous occasions, however, we have considered the meaning and breadth of this term. *Id.* "We have held that actionable coercion is 'the application to another of such force, either physical or *moral*, as to constrain him to do against his will something he would not otherwise have done' " (emphasis added). *Id.*, quoting *Planned Parenthood League of Mass., Inc.* v. *Blake*, 417 Mass. 467, 474, cert. denied, 513 U.S. 868 (1994). "It is 'the active domination of another's will.' " *Buster* v. *George W. Moore, Inc.*, *supra*, quoting *Planned Parenthood League of Mass., Inc.* v. *Blake*, *supra*. "Thus, we have recognized that coercion may take various forms, and we have not limited its

scope to actual or attempted physical force." *Buster* v. *George W. Moore, Inc., supra* at 646-647, and cases cited. "For example, we have suggested that coercion may be found where one party deprives another of rights due under a contract, see *Redgrave* v. *Boston Symphony Orch., Inc.,* 399 Mass. 93 (1987), or makes it impossible, due to sexual harassment, for another to continue her employment, *O'Connell* v. *Chasdi,* [400 Mass. 686, 694 (1987)]." *Buster* v. *George W. Moore, Inc., supra* at 647. We have also concluded that, "in certain circumstances, economic coercion, standing alone, may be actionable." *Id.* at 648. Whether conduct constitutes coercion is examined from an objective, reasonable person standard. See *Haufler* v. *Zotos,* 446 Mass. 489, 505 (2006); *Planned Parenthood League of Mass., Inc.* v. *Blake, supra* at 474-475.

Assuming, without deciding, that Currier possessed a right under the State or Federal Constitution or laws to express breast milk at any time, we conclude that the NBME's interference with that right does not constitute the kind of "coercion" contemplated by the civil rights act. We have determined that the direct violation of a right by itself is not the equivalent of coercion. See, e.g., *Longval* v. *Commissioner of Correction,* 404 Mass. 325, 333-334 (1989) (direct violation of person's rights does not by itself involve coercion; even unlawful conduct lacks this quality when all it does is take someone's rights away directly); *Pheasant Ridge Assocs. Ltd. Partnership* v. *Burlington,* 399 Mass. 771, 781 (1987) (unlawful taking did not itself interfere with or attempt to interfere with plaintiffs' rights by coercion). Here, the NBME did not prohibit Currier from expressing breast milk; rather, the NBME prohibited Currier from expressing breast milk when she wanted to, namely, during two requested additional break times. In circumstances where the NBME offered Currier a private examination room with a power outlet where she could express breast milk during the exam, we cannot say, objectively assessed, that the NBME's denial of additional break time to Currier effected coercion within the meaning of the civil rights act. We add that the alleged adverse economic consequences of not being able to express breast milk when Currier wanted is tenuous at best. For example, a failing score in such circumstances could be attributed

to a lack of knowledge or studying and not necessarily from being denied her request for additional break time. The judge properly allowed summary judgment to the NBME on this claim.

4. *Equal rights act.* Currier contends that the NBME's break time or accommodations policy denies her the benefits of her contractual relationship with the NBME and amounts to unlawful sex discrimination because the policy permits her male counterparts sufficient break time to eat, drink, and use the restroom, while she is required to forgo her break time for such purposes so that she may instead express breast milk. Although the NBME's break time policy on its face is gender neutral, Currier claims it disparately impacts a subclass of women (lactating mothers) and therefore discriminates purposefully against them. She also maintains that purposeful discrimination may be inferred because the NBME has made exceptions to its accommodations policy for individuals with temporary medical conditions that do not qualify as disabilities under the ADA, but would not make an exception for lactating mothers.

The equal rights act provides, in pertinent part:

> "All persons within the commonwealth, regardless of sex, race, color, creed or national origin, shall have . . . the same rights enjoyed by white male citizens, to make and enforce contracts, . . . and to the full and equal benefit of all laws . . . ."

G. L. c. 93, § 102 (*a*). A prevailing party "shall be entitled to an award of the costs of the litigation and reasonable attorneys' fees in an amount to be fixed by the court." *Id.* at § 102 (*d*).

In construing the equal rights act, "[w]e look to the cognate Federal provision[s] [42 U.S.C. §§ 1981 & 1982] for guidance." *LaCava* v. *Lucander*, 58 Mass. App. Ct. 527, 535 (2003). See *Thurdin* v. *SEI Boston, LLC*, 452 Mass. 436, 440 (2008). The statute prohibits private acts of discrimination. *CBOCS West, Inc.* v. *Humphries*, 553 U.S. 442, 447 (2008). See *Dartmouth Review* v. *Dartmouth College*, 889 F.2d 13, 17 (1st Cir. 1989), overruled on other grounds by *Educadores Puertorriquenos en Accion* v. *Hernandez*, 367 F.3d 61, 66-67 (1st Cir. 2004) (concluding that there are no heightened pleading standards for civil rights cases). "Only discrimination that is both purposeful and

based on sex . . . comes within the reach of the statute; if any element is missing, a claim under the statute fails." *LaCava* v. *Lucander, supra* at 535-536, citing *Dartmouth Review* v. *Dartmouth College, supra.*

The equal rights act only prohibits discrimination based on, insofar as relevant here, "sex." G. L. c. 93, § 102 (*a*). We are aware of no cases construing the Federal cognate provisions of the equal rights act that have found breastfeeding or lactation to be within the scope of sex discrimination. Indeed, even in the context of the pregnancy discrimination act, 42 U.S.C. § 2000e (2006), one Federal court has noted that "no judicial body thus far has been willing to take the expansive interpretative leap to include rules concerning breast-feeding within the scope of sex discrimination."[13] *Derungs* v. *Wal-Mart Stores, Inc.,* 374 F.3d 428, 439 (6th Cir. 2004). We are not, however, constrained to follow suit in interpreting the breadth of coverage of our statute. See *Massachusetts Elec. Co.* v. *Massachusetts Comm'n Against Discrimination,* 375 Mass. 160, 167 (1978) ("While interpretations of a Federal statute which is similar to the State statute under consideration are often helpful in setting forth all the various policy considerations, such interpretations are not binding on a State court construing its own State statute").

In the employment discrimination context (under G. L. c. 151B) we held, departing from Federal law concerning the scope of coverage, that the exclusion of pregnancy-related disabilities from a comprehensive disability plan amounted to sex discrimination. *Id.* at 168. We did so because "[p]regnancy is a condition unique to women, and the ability to become pregnant is a primary characteristic of the female sex." *Id.* at 167. We concluded, therefore, that "any classification which relies on pregnancy as the determinative criterion is a distinction based on sex." *Id.* See *School Comm. of Brockton* v. *Massachusetts Comm'n Against Discrimination,* 377 Mass. 392, 398 (1979)

[13]For an overview of Federal legislation and case law interpreting this legislation concerning the scope of sex discrimination and the inclusion of lactating mothers within this class, see Note, Breastfeeding or Bust: The Need for Legislation to Protect a Mother's Right to Express Breast Milk at Work, 10 Cardozo Women's L.J. 146 (2003) (Note). See also Comment, For Crying Out Loud: Ohio's Legal Battle With Public Breastfeeding and Hope for the Future, 13 Am. U. J. Gender Soc. Pol'y & L. 669 (2005).

(following precedent set forth in *Massachusetts Elec. Co.* v. *Massachusetts Comm'n Against Discrimination*, *supra*, that pregnancy is sex-linked classification and concluding that excluding pregnancy from sick leave coverage is discrimination based on sex). This same reasoning applies to the expression of breast milk (whether by breastfeeding or by expressing pursuant to a pump). The condition of lactation is inextricably linked to pregnancy and thus sex linked. The fact that a woman is no longer pregnant when she is nursing or pumping matters not as lactation is a natural incident of pregnancy.[14] We thus conclude that the protections of the equal rights act extend to lactating mothers.

We note, however, that discrimination claims set forth under the cognate Federal provisions to the equal rights act require intentional discrimination and do not permit a plaintiff to proceed under a "disparate impact" analysis. See *General Bldg. Contrs. Ass'n* v. *Pennsylvania*, 458 U.S. 375, 391 (1982) (concluding that violation of § 1981 must result only from purposeful discrimination and may not result from disparate impact). We have not departed from this Federal construct and we decline to do so now.[15] See *LaCava* v. *Lucander, supra* (requiring "purposeful" discrimination for equal rights act claim). Our conclusion in this regard does not foreclose Currier's equal rights act claim. On the record before us there exist issues of fact in dispute that bear on her claim of purposeful discrimination. Currier's evidence that the NBME made various exceptions to its accommodations policy for persons who did not have a disability under the ADA, but not for a lactating mother, see note 5, *supra*, is sufficient to permit an inference of intentional discrimination.[16] See *Gu* v. *Boston Police Dep't*, 312 F.3d 6, 13 (1st Cir. 2002) ("A departure

---

[14]"Immediately following the birthing of a child, a woman's body produces colostrums, a type of pre-milk, which is filled with antibodies and believed to help an infant fight infection when those antibodies are delivered to the child through breastmilk." Note, *supra* at 147 n.5, citing S.M. Love, Dr. Susan Love's Breast Book 34 (Perseus Publishing 2000). The hormone changes associated with pregnancy enable a pregnant woman's body to prepare for the production of milk after her baby is born. See Note, *supra* at 153 n.44.

[15]Currier does not cite to any cases where we have allowed a disparate impact claim to proceed under our equal rights act.

[16]The NBME maintains that Currier was afforded the same contractual rights as male examinees. This statement overlooks that the NBME sought to

from prior practice can indeed be probative of discriminatory intent"); *Trustees of Health & Hosps. of Boston, Inc.* v. *Massachusetts Comm'n Against Discrimination*, 449 Mass. 675, 686 (2007) (implementation of layoff procedure against African-American employees, but not against employees who were not African-Americans evidence of discriminatory animus). The issue, thus, is not appropriate for summary judgment and remains a matter for a jury to decide after discovery is completed. Consequently, the judge's order granting summary judgment in favor of the NBME on this claim is reversed. An order is to enter denying both parties' motions for summary judgment on this claim.[17]

5. *Public accommodations law.* Currier contends that the NBME's decision not to provide her with additional break time violated the public accommodations law, G. L. c. 272, § 98, by discriminating against her on the basis of her "sex" in a place of public accommodation. We agree.

General Laws c. 272, § 98, provides:

"Whoever makes any distinction, discrimination or restriction on account of . . . sex . . . relative to the admission of any person to, or his treatment in any place of public accommodation, resort or amusement, as defined in [§ 92A], or whoever aids or incites such distinction, discrimination or restriction, shall be punished by a fine of not more than [$2,500] or by imprisonment for not more than one year, or both,[18] and shall be liable to any person aggrieved thereby for such damages as are enumerated in [G. L. c. 151B, § 5]; provided, however, that such civil forfeiture shall be of an amount not less than [$300]. . . . All persons shall have the right to the full and equal accommodations, advantages, facilities and privileges of any

---

prohibit Currier from taking her standard break time for purposes unrelated to expressing breast milk.

[17]Whether Currier wishes to continue with litigation on this claim is for her to decide. We note, however, that she may only recover costs and attorney's fees under the equal rights act as a prevailing party. See G. L. c. 93, § 102 (*d*).

[18]We point out that we are not reviewing a *criminal* case against the NBME and therefore are not required to construe the statute narrowly. See *Commonwealth* v. *Spearin*, 446 Mass. 599, 604 (2006) ("Criminal statutes, of course, are to be strictly construed").

place of public accommodation, resort or amusement subject only to the conditions and limitations established by law and applicable to all persons. This right is recognized and declared to be a civil right."

The statute defines a "place of accommodation, resort or amusement" "as and shall be deemed to include any place, whether licensed or unlicensed, which is open to and accepts or solicits the patronage of the general public." G. L. c. 272, § 92A. The statute goes on to list several enumerated places "without limiting the generality of this definition." Id.

We first take up the NBME's argument that it is not a "place of public accommodation" because it does not maintain a physical presence in Massachusetts at a particular location or site. When § 92A was originally enacted, the term "place of public accommodation" was narrowly defined, "restricted essentially to inns, eating and recreation facilities, conveyances, barber shops, and theatres." Local Fin. Co. v. Massachusetts Comm'n Against Discrimination, 355 Mass. 10, 13 (1968). Over time, however, the Legislature has materially broadened the scope of the term, specifically by including the words "any place" in its definition. Id. As such, we have determined that the enumerated specific examples of places of accommodation "do not restrict the preceding general statutory language." Id. Said another way, the list is nonexclusive. In addition, because the statute is an antidiscrimination statute, we have directed that, in construing its reach, we give it "a broad, inclusive interpretation" to achieve its remedial goal of eliminating and preventing discrimination. Id. at 14.

Any person who is "aggrieved" by an alleged violation of the public accommodation statute may file a complaint with the Massachusetts Commission Against Discrimination (commission), which will investigate, conciliate, and adjudicate the matter under the procedures set forth in c. 151B and, where appropriate, order affirmative relief calculated to effectuate the goal of the statute. See G. L. c. 272, §§ 92A, 98, 98A; G. L. c. 151B, §§ 5, 9. With the integration of the statute into c. 151B, the Legislature essentially delegated to the commission the authority in the first instance to interpret the statute and determine its scope. We thus are guided in our interpretation of the statute by the construction afforded by the commission. See Bynes v. School Comm. of Boston,

411 Mass. 264, 269 (1991) (giving commission's interpretation of its governing statute substantial deference).

In its construction of the statute, the commission has concluded that the "equal accommodations, advantages, facilities and privileges" afforded by the statute are not restricted to a person's entrance into a physical structure. See *Samartin* v. *Metropolitan Life Ins. Co.*, 27 Mass. Discrimination Law Rep. 210, 213-214 (2005). Rather, the statutory protections extend to situations where services are provided that do not require a person to enter a physical structure, requiring equal access to the advantages and privileges of services and service providers. See *id.* at 214. In so concluding, the commission relied on various Federal decisions, including one where a trade association that sponsored a health benefits plan was liable under the ADA because the court concluded that a "public accommodation" is not limited to actual physical structures. See *Carparts Distrib. Ctr., Inc.* v. *Automotive Wholesalers Ass'n of New England*, 37 F.3d 12, 20 (1st Cir. 1994); *Samartin* v. *Metropolitan Life Ins. Co., supra.* The commission noted that times are such today where business is increasingly conducted through the Internet or over telephones. *Id.* To limit the statute's reach to physical accessibility would be contrary to the goals of the statute and "would allow any number of discriminatory actions that the statute prohibits." *Id.* The commission provided an example to illustrate its point: "individuals who receive inferior or limited services [of] a restaurant because of their race would have no relief so long as the restaurant did not prevent their access to the property." *Id.* We agree with this reasoning.

Here, while Prometric, not the NBME, provides the physical location of the testing, Prometric is only the arm of the NBME and was hired or contracted by the NBME to host the exam.[19] Only the NBME, and not Prometric, controls the conditions under which the exam is administered and whether accommodations may be granted to examinees taking the exam. The hiring of a separate entity to host the exam is the only factor that departs from cases involving a traditional physical location. In view of the broad remedial purposes of the statute and its statutory his-

---

[19]The parties do not dispute that the Brookline testing center itself is a place of public accommodation under G. L. c. 272, § 92A.

tory, we refuse to let the NBME escape the reach of the statute by contracting out another to provide a physical site for the services that the NBME solely provides. Regardless, the active provision of testing services in Massachusetts, which services by their nature are mobile, is sufficient to bring the NBME within the reach of the statute.

The NBME also contends that it is entitled to summary judgment because there is no evidence that it restricted or interfered with Currier's use of the testing site. In support of its argument the NBME asserts that Currier was allowed to use the testing facility and was given the same amount of break time as other examinees. This argument ignores that the public accommodation statute grants all persons "the right to the full and equal accommodations, *advantages*, facilities and privileges of any place of public accommodation" (emphasis added). G. L. c. 272, § 98. Here, women who are expressing breast milk are denied the advantage of having a fifteen-minute introductory tutorial as well as forty-five minutes of break time to eat, rest, and use the restroom, because all or nearly all of that break time is consumed by expressing breast milk. As a result, a subclass, comprised only of women, are denied advantages of adequate break time. Thus, the NBME's argument lacks merit.

The language of the public accommodation statute, see G. L. c. 272, § 98 ("All persons shall have the right to the full and equal accommodations, advantages, facilities and privileges of any place of public accommodation"), is broader than that of the equal rights act and shows no intent to limit its application to only cases involving intentional, purposeful discrimination. The commission has determined in at least one case that a showing of disparate impact is sufficient to make out a discrimination claim under § 98. See *Commonwealth* v. *Fung Wah Bus Transp., Inc.*, 31 Mass. Discrimination Law Rep. 24 (2008). In deference to the commission's interpretation and the statute's remedial purpose (when only a civil remedy is sought), we conclude, as a matter of law, that Currier's disparate impact claim is not prohibited under the public accommodation statute.

Last, we reject the NBME's argument that the judge correctly concluded that there was no evidence that the NBME discriminated against Currier on the basis of her "sex" under the statute.

This issue is one of law. In view of the broad remedial purposes of the statute and the rationale employed in our analysis of what is included in the term "sex" in the context of the equal rights act, we conclude that the protections of the public accommodation statute extend to lactating mothers because we find lactation to be a sex-linked distinction or classification. Where the NBME did not sufficiently rebut Currier's expert evidence concerning the amount of time needed to express breast milk properly and the adverse medical consequences of not doing so, and where the only explanation for its conduct, in the context of the public accommodation statute, has been arguments grounded in law concerning the scope and interpretation of the statute, which we have rejected, we conclude that Currier is entitled to summary judgment on this claim and that the judge erroneously granted summary judgment in favor of the NBME on this claim.[20] We emphasize that our conclusion is based on a set of unique facts, including the fact that a lactating mother was required (or faced adverse professional consequences) to be present at the place of public accommodation for a lengthy period of time (nine consecutive hours), and takes into account the fact that the NBME did not make any showing that it could not reasonably accommodate Currier's need without incurring undue hardship (such as, for example, incurring exorbitant or unrecoverable costs associated with providing a private room with an electrical outlet for a woman to express breast milk).

6. *Constitutional claim.* In her complaint, Currier alleges that, in refusing to grant her additional break time during the exam to enable her to express breast milk, the NBME violated her "right to privacy" embodied in arts. 1, 10, and 12.[21] Where, as here, we decide the case in Currier's favor on an available

---

[20]In view of our conclusion, we do not consider the NBME's request that we reverse the judge's dismissal of that portion of its counterclaim that seeks a declaratory judgment stating that the NBME's gender-neutral accommodations policy does not disparately impact women.

[21]We note that in developing her State constitutional argument, Currier cites arts. 1, 10, and 12 of the Massachusetts Declaration of Rights, but only specifically identifies language in art. 1, as amended by art. 106 of the Amendments, as a source of protection of her right to express breast milk. We also note that although Currier states in her brief that her decision to breastfeed is protected under the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, she did not set forth any Federal

statutory ground, a decision on a constitutional issue is unnecessary. See *Commonwealth* v. *Vega*, 449 Mass. 227, 234 (2007) ("we generally decline to reach constitutional questions where, as here, there is a readily available statutory ground that renders such a decision unnecessary"). Accordingly, we decline to address this claim.[22]

7. *Conclusion.* The judgments of dismissal of Currier's most recent complaint and the NBME's counterclaims are vacated. Because each party sought declaratory relief, there must be a declaration of the rights of the parties. *Cherkes* v. *Westport*, 393 Mass. 9, 12 (1984). *Boston* v. *Massachusetts Bay Transp. Auth.*, 373 Mass. 819, 829 (1977). This is so even when relief is denied to a party. *Cherkes* v. *Westport*, supra. *Boston* v. *Massachusetts Bay Transp. Auth.*, supra. Thus, the case is remanded to the Superior Court for further proceedings consistent with our opinion. Such further proceedings are to include the entry of a declaration that, consistent with our opinion, the NBME is not entitled to the relief sought in its counterclaim. In view of the existing triable claim under the equal rights act, it would be premature for us to direct the judge to enter a final judgment declaring the rights of the parties as to Currier's complaint.

*So ordered.*

---

constitutional claims in her complaint. See *Amherst Nursing Home, Inc.* v. *Commonwealth*, 398 Mass. 850, 852 (1986) (we generally refuse to consider arguments raised for first time on appeal).

[22]We cannot conclude that no set of facts would ever establish a constitutional claim against the NBME in the future, which essentially is the relief sought by the NBME in its counterclaim. Such relief sought is "no more than a request for an advisory opinion." *Bunker Hill Distrib., Inc.* v. *District Attorney for the Suffolk Dist.*, 376 Mass. 142, 145 (1978). "Parties are not entitled to decisions upon abstract propositions of law unrelated to some live controversy. . . ." *Id.*, quoting *Cole* v. *Chief of Police of Fall River*, 312 Mass. 523, 526 (1942), appeal dismissed sub nom. *Cole* v. *Violette*, 319 U.S. 581 (1943). See *Hubrite Informal Frocks, Inc.* v. *Kramer*, 297 Mass. 530, 534 (1937), quoting *Mills* v. *Green*, 159 U.S. 651, 653 (1895) ("The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon . . . abstract propositions . . ."). We therefore decline to enter the declaratory judgment requested by the NBME in its counterclaim.