GALLAGHER vs. SOUTH SHORE HOSPITAL, INC., 101 Mass. App. Ct. 807

 
 SUSAN GALLAGHER [Note 1] vs. SOUTH SHORE HOSPITAL, INC., & others. [Note 2]

101 Mass. App. Ct. 807
 January 6, 2022 - October 6, 2022

Court Below: Superior Court, Barnstable County
Present: Green, C.J., Sullivan, & Henry, JJ.

 

No. 21-P-207.

Constitutional Law, Conduct of government agents. Search and Seizure, Consent, Warrant, Exigent circumstances. Massachusetts Civil Rights Act. Civil Rights, Immunity of public official. Immunity from Suit. Trespass. False Imprisonment. Consent. Hospital. Health Care Proxy.

Discussion of the procedures of the Executive Office of Elder Affairs for investigating allegations of elder abuse, as set forth in G. L. c. 19A, §§ 15-24, and 651 Code Mass. Regs. §§ 5.00. [818-821]

In a civil action in which the plaintiff asserted claims arising out of an investigation of her by the defendants (a police officer and an elder care caseworker), pursuant to a report of elder abuse under G. L. c. 19A, § 15, the evidence, viewed in the light most favorable to the plaintiff, showed that the defendants entered the plaintiff's home without a warrant or reasonable belief that there were exigent circumstances justifying their entry and without providing notice or obtaining a court order as required by G. L. c. 19A [821-823]; further, the defendants could not invoke the community caretaking exception to the warrant requirement to justify their warrantless entry into the home, where they were engaging in an investigation governed by G. L. c. 19A, which delineates when investigators may enter a home incident to such an investigation, and where the plaintiff offered proof sufficient to permit a reasonable trier of fact to conclude that no emergency existed [823-824].

In a civil action in which the plaintiff asserted claims under the Massachusetts Civil Rights Act, G. L. c. 12, §§ 11H-11I, alleging that the defendants (a police officer and an elder care caseworker) violated the rights of the plaintiff and an elder for whom she provided care under art. 14 of the Massachusetts Declaration of Rights by illegally entering their home and seizing the elder using threats, intimidation, or coercion, a genuine dispute of material fact existed regarding whether the defendants interfered with the rights of the plaintiff and the elder by intimidation or coercion [824-827]; further, on the summary judgment record, the defendant police officer was not entitled to qualified immunity, where the plaintiff offered proof sufficient to permit a reasonable trier of fact to conclude that no emergency existed and therefore 

 Page 808 

the defendants could not invoke the community caretaking function to allow a warrantless entry into the home, and where the law was settled as to what the officer was supposed to do under such circumstances, given that G. L. c. 19A, § 20 (b), instructs officials to seek out a court order when there is reasonable cause to believe an elder is in need of emergency care [827-829].

In a civil action in which the plaintiff asserted, inter alia, a claim of trespass, the Superior Court judge erred in granting summary judgment in favor of the defendants, where there was no dispute that the defendants entered and remained in the plaintiff's home without permission and after her repeated demands that they leave, and where proof of injury was not required for the plaintiff to maintain an action against a stranger for interfering with her possession of real estate. [829-831]

In a civil action in which the plaintiff asserted, inter alia, a claim of false imprisonment on behalf of the elder for whom she provided care, the defendant police officer and defendant elder care caseworker, who were investigating the plaintiff pursuant to a report of elder abuse under G. L. c. 19A, § 15, were not entitled to summary judgment, where a jury could have found that the defendants intentionally and wrongfully caused the elder to be confined within the plaintiff's home, an ambulance, and a hospital [831-833]; further, the defendant hospital was not entitled to summary judgment, where a jury could have found that the hospital falsely imprisoned the elder for some or all of his stay, given that two of the elder's days at the hospital occurred after the hospital told the elder care caseworker that the elder was going to be discharged and the caseworker told the hospital that she would be seeking a court order to prevent that from happening, and where neither the Federal Emergency Medical Treatment and Active Labor Act nor Federal regulations entitled the hospital to judgment as a matter of law [833-834].

In a civil action in which the plaintiff asserted, inter alia, a claim of battery against the defendant hospital on behalf of the elder for whom she provided care, the hospital was not entitled to summary judgment, where it would have been reasonable and possible for a jury to conclude that the hospital's actions in drawing the elder's blood and urine, conducting other assessments, and admitting him constituted a battery, given that such actions were undertaken without obtaining the consent of the plaintiff, whom the hospital knew to be the elder's health care proxy. [834-835]

Civil action commenced in the Superior Court Department on February 14, 2017.

 Motions for summary judgment were heard by Robert C. Rufo, J., and Diane C. Freniere, J.

Gregory A. Hession for the plaintiff.

Bradford N. Louison for Jennifer Pompeo.

 Deawn C. Takahashi for Elder Services of Cape Cod and the Islands, Inc., & another.

Ashley E. Russo for South Shore Hospital, Inc.

 HENRY, J. The Executive Office of Elder Affairs (EOEA) has a duty to investigate reports of elder abuse that are made pursuant 

 Page 809 

to G. L. c. 19A, § 15 (§ 15 report), and the Legislature has created a comprehensive statutory scheme setting forth procedures for doing so. See G. L. c. 19A, §§ 15-24. At the same time, the interior of the home is "the most sacred, constitutionally protected area," Commonwealth v. Yusuf, 488 Mass. 379, 380 (2021), and individuals in the Commonwealth have "a right to [forgo] [medical] treatment" and "a strong interest in being free from nonconsensual invasion of [their] bodily integrity" (quotation and citations omitted), Harnish v. Children's Hosp. Med. Ctr., 387 Mass. 152, 154 (1982). This case, which comes to us on appeal from judgments entered for the four defendants on motions for summary judgment, concerns the balance between these interests.

 While there are disputes of fact that we detail infra, the undisputed facts are these. For ten years prior to March 30, 2016, when retired Roman Catholic priest Father Philip LaPlante passed away at the age of ninety-five, the plaintiff, Susan Gallagher, provided LaPlante [Note 3] with care in her home where he also lived. Gallagher held a health care proxy and a power of attorney for LaPlante.

 On June 25, 2015, Weymouth police Officer Jennifer Pompeo and elder care caseworker Eileen Schoener entered the Gallagher/LaPlante home without permission, notice, or court order while investigating Pompeo's § 15 report alleging neglect and verbal abuse of LaPlante by Gallagher. They remained there over Gallagher's objections and caused LaPlante to be transported to the hospital, also over Gallagher's objections. Without Gallagher's consent, LaPlante was examined at the hospital and admitted for five days. He was discharged in Gallagher's care after a judge rejected a request for a protective order. Ultimately, it was determined that no medical condition had required LaPlante's hospitalization. A subsequent investigation did not substantiate the allegations of abuse or neglect.

 On behalf of herself and LaPlante's estate, Gallagher sued Pompeo in her individual capacity; Schoener in her individual capacity; Schoener's employer, Elder Services of Cape Cod and the Islands, Inc. (ESCC), on a theory of vicarious liability for Schoener's actions; and South Shore Hospital, Inc. (hospital). Gallagher asserted claims on behalf of herself and LaPlante, against Pompeo and Schoener, for violation of civil rights (count one); on her own behalf against Pompeo, Schoener, and ESCC for trespass (count two); on behalf of LaPlante, against Pompeo, Schoener, ESCC, and the hospital, for false imprisonment (counts 

 Page 810 

three and four [Note 4]); and on behalf of LaPlante, against the hospital, for battery (count five). A judge of the Superior Court (first judge) allowed a motion by Pompeo for summary judgment on counts one, two, and three. [Note 5] Thereafter, a different judge (second judge) allowed Schoener's and ESCC's motion for summary judgment on those same counts. The second judge also allowed the hospital's motion for summary judgment on counts four and five. A separate and final judgment entered in favor of Pompeo, followed by a judgment dismissing Gallagher's complaint. Gallagher appeals. We have carefully reviewed the record, and we conclude that there are material factual disputes that preclude the entry of summary judgment. We also conclude that on this record, Pompeo is not entitled to summary judgment on the civil rights claim predicated on a claim of qualified immunity. Accordingly, we reverse.

 Standard of review. The standard of review of a grant of summary judgment is de novo. See Ritter v. Massachusetts Cas. Ins. Co., 439 Mass. 214, 215 (2003). Summary judgment is appropriate where, "viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law." Lev v. Beverly Enters. - Mass., Inc., 457 Mass. 234, 237 (2010), quoting Cargill, Inc. v. Beaver Coal & Oil Co., 424 Mass. 356, 358 (1997). The burden rests on the moving parties, here the defendants, to demonstrate "the absence of triable issues by showing that the party opposing the motion has no reasonable expectation of proving an essential element of its case" (citation omitted). Boazova v. Safety Ins. Co., 462 Mass. 346, 350 (2012).

 Factual background. [Note 6] In 2005, LaPlante executed a Massachusetts health care proxy that conformed to the statutory form, see G. L. c. 201D, naming Gallagher as his agent and giving her 

 Page 811 

unlimited authority "if [his] attending physician determines in writing that [he] lack[s] the capacity to make or to communicate health care decisions." Pursuant to the proxy, Gallagher made all health care decisions for LaPlante. He had good days and bad days in terms of his ability to speak with others. LaPlante also could be combative at times, to the point of bruising Gallagher. Gallagher also had LaPlante's power of attorney.

 In June 2015, Gallagher read in the Weymouth Senior Center bulletin about a "Friendly Visitor Program," a program where "someone comes to your house and gives the caregiver a break for an hour or two, and just sits with the elder." On Friday, June 19, and Monday, June 22, Gallagher called the senior center and asked if any volunteers were available in the future to stay with LaPlante while she went grocery shopping. Elder Outreach Services Weymouth employee Ann Bessette, whose duties included "help[ing] people get help or mak[ing] referrals" for services, told Gallagher she would need to check with her volunteer coordinator. [Note 7] For reasons not clear in the record, Bessette's response to Gallagher's request for assistance was to arrive unannounced on Tuesday, June 23, [Note 8] at the home of Gallagher and LaPlante with Pompeo as a police escort, for a "wellness check." [Note 9] Pompeo "felt it would be best for Ms. Bessette" if Pompeo went along because it was her opinion that Gallagher "ha[d] been confrontational in the past." [Note 10]

 Page 812 

 When Pompeo and Bessette arrived at the home, they saw LaPlante seated in his wheelchair by the open front door, appropriately dressed, appearing well cared for, and eating food from a Burger King restaurant. Gallagher came to the door and told the pair that she had gone grocery shopping earlier that afternoon but LaPlante became combative, "hitting and punching" her, and refused to get out of the car. Gallagher therefore asked a man and woman who were walking together in the parking lot to sit with LaPlante while she shopped. Gallagher took her car keys and the individuals' Massachusetts identifications into the store with her. She left the windows of the car down because it was "wonderful" "summer weather," in which she had dressed LaPlante in a light sweater. She watched them from the door of the market but not while walking through all of the aisles. When she came out of the store a short time later, LaPlante was teaching the woman the rosary.

 Upon hearing this information, Pompeo demanded the names of the individuals. Gallagher provided the full name of the woman and the last name of the man. Pompeo obtained information indicating that the woman had two active warrants for violations of G. L. c. 209A abuse prevention orders and eleven arraignments for crimes such as fraud, larceny, and disorderly conduct. She was known to the Weymouth police as a narcotics user. Pompeo believed the male was one of two brothers, both of whom had multiple arraignments on their records for crimes such as armed assault. Pompeo "advised Ms. Gallagher that her actions as Mr. LaPlante's caretaker were inexcusable" given these individuals' histories, and stated that she would be filing a § 15 report with South Shore Elder Services. Nothing in the record indicates that Gallagher or LaPlante received written notification that an investigation would follow the § 15 report.

 Pompeo filed a § 15 report with South Shore Elder Services the same day, June 23, because she believed that Gallagher leaving LaPlante "with two people that she doesn't know in a hot car without keys in it" showed "that Gallagher makes poor 

 Page 813 

decisions." [Note 11] South Shore Elder Services, the agency designated by EOEA to investigate reports where Gallagher lived, declined to investigate Pompeo's report, so EOEA asked ESCC to do so. [Note 12] ESCC assigned Schoener. Schoener testified at her deposition that her agency had five days to make contact with LaPlante under G. L. c. 19A, §§ 15-24, and 651 Code Mass. Regs. §§ 5.00, a statutory and regulatory framework that is set forth in more detail below. For now, it suffices to say that Schoener's understanding that she had five days suggests Pompeo's § 15 report was screened for a "regular" response rather than an "emergency" or "rapid" one. See 651 Code Mass. Regs. § 5.10(2)(d) (1998).

 On Wednesday, June 24, Schoener called the home of Gallagher and LaPlante and left a message that Gallagher received at 4:30 P.M. Gallagher "immediately" called her lawyer, who returned Schoener's call and left a message, which Schoener did not return. Schoener and her supervisor agreed that Schoener should make an unannounced home visit with a police officer to meet with LaPlante. At around 10 A.M. the next day, June 25, Pompeo and Schoener arrived at the home of Gallagher and LaPlante to conduct an unannounced visit.

 Gallagher and LaPlante had a morning routine that varied because LaPlante "rallie[d] at different times of the day." In June 2015, "[i]t was starting to be more like around 11 [A.M.]" that he would "rally." When Pompeo and Schoener arrived at around 10 A.M. on June 25, they saw the front door open and glass storm door closed. Pompeo believed Gallagher was home because her car was parked outside. Pompeo knocked several times and rang the doorbell, which was broken. [Note 13] Schoener "attempted again to contact" Gallagher, presumably by telephone, "but there was no ans[w]er."

 There is a material dispute whether Pompeo, when standing 

 Page 814 

outside the home, could see LaPlante inside the home lying on the couch. In the light most favorable to Gallagher, Pompeo and Schoener, standing outside the home at the front door, could not see the couch. [Note 14] Pompeo's June 25 police report indicates that she saw LaPlante after she opened the storm door. Pompeo testified at her deposition, however, that from her position at the door, she could see LaPlante lying on the couch in the living room, and she became concerned when he did not move in response to the doorbell and knocks.

 There is no dispute, however, that Pompeo called her supervisor within twenty minutes after arriving and informed him that she needed to enter the home and perform a wellness check based on "exigent circumstances" -- that she later defined as LaPlante being "unattended" when she knew he needed around-the-clock care. It is unclear why she presumed LaPlante was unattended when she had seen Gallagher's car outside and believed she was home. Gallagher asserts she was upstairs in the home completing "domestic duties" and could see LaPlante from the loft in the home.

 Pompeo entered the home without permission and announced her presence several times. Schoener followed. Upon entering, Pompeo could hear the shower running upstairs and saw LaPlante asleep on the couch. She testified that she was concerned for his health because he "didn't look the same as he had" two days earlier. Schoener yelled to Gallagher, "Get down here Susan." Gallagher came down the stairs and told Pompeo and Schoener to leave, to "get out," and to "get out of my house," but they did not leave. Instead, Schoener, without providing any documentation from her agency explaining its process for investigating § 15 reports "demanded" to see the health care proxy and power of attorney and told Gallagher, "It will go easier on you if you talk." [Note 15] Gallagher felt Schoener was yelling at her and "took over [her] house." Gallagher called her lawyer and stated that she did not have to answer Schoener's or Pompeo's questions, but still 

 Page 815 

produced the health care proxy and power of attorney, which Schoener reviewed. Gallagher also provided the name of LaPlante's primary care physician (PCP). Schoener attempted to reach the PCP but was unsuccessful. Although she was concerned because LaPlante appeared nonverbal, Schoener testified that she "had no knowledge of whether or not the health care proxy was invoked" because she was unable to reach the PCP.

 Meanwhile, Pompeo summonsed others to the home. At 10:21 A.M., Pompeo called Fallon Ambulance, a decision Schoener supported because she believed LaPlante was "non-verbal," "disheveled looking," and "pale." In the light most favorable to Gallagher, LaPlante's condition was his baseline. Gallagher knew LaPlante was in a "deep sleep" because he had exerted himself physically the day before. Gallagher also knew LaPlante could get combative if he was awakened before he was ready.

 Pompeo then called her supervisor and asked him to come to the home. The supervisor arrived before emergency medical technicians (EMTs) from Fallon came with an ambulance at 10:40 A.M. According to Gallagher, the EMTs "just went on whatever [Pompeo] wanted them to do." Pompeo asked one of the EMTs if they could "get [Gallagher] on dehydration?" The EMT report stated that LaPlante's vital signs were "normal" and that he "becomes combative when examined, appears dehydrated with +skin [Note 16] tenting." The EMTs noted in their report that LaPlante's clothing and sheets were "soaked through with urine," and Gallagher acknowledged that he had urinated during the night. She testified that in this time period LaPlante was wearing an adult incontinence product and "[t]hey had a morning routine which was interrupted, which included cleaning [LaPlante]." [Note 17] Gallagher refused medical transport for LaPlante. At 11:11 A.M., however, the EMTs obtained approval from Fallon's on-call doctor, "LaPlante was put on the stretcher[,] and Ms. Gallagher was asked to step out of their way, but she did not move." Pompeo's supervisor "had to ask [Gallagher] more than once to get out of the way of the EMTs before she moved." LaPlante did not wake during the events at the home. He was taken by ambulance to the hospital while Gallagher followed in her vehicle.

 Page 816 

 At the hospital, LaPlante's PCP, who provided home visits, was contacted and said "[h]e feels very strongly" that Gallagher was "very vigilant" and that LaPlante was "well taken care of" by Gallagher. After noting that "the patient himself is not able to provide a history," and despite having spoken with the PCP, the hospital's emergency room department did not obtain Gallagher's consent before performing an examination of LaPlante that consisted of physical inspection, blood work, imaging, and urinalysis. Gallagher felt the examination was "abusive" and "intrusive." She insisted that a nurse not use a straight catheter to collect urine samples as that "would cause my elder great pain" due to a medical condition he had, but the nurse "yelled" that she knew what she was doing. Gallagher responded, "You know how to insert a cath[eter], that's fine, but you don't know the idiosyncrasies of this patient. You need to listen to my input." Emergency room staff, perceiving Gallagher as "quite hostile and agitated," called Pompeo to escort Gallagher from the room while they continued the examination. Thus, Gallagher did not know what kind of catheter ultimately was used. [Note 18]

 LaPlante awoke in the emergency room, became combative, and "vigorously repelled all . . . attempts to examine him." His blood work did not show dehydration. LaPlante had one bedsore measuring two centimenters by one-half centimeter, of which the PCP was aware and which Gallagher was treating. Nevertheless, the hospital admitted him for five days because the doctors wished to conduct neurological, psychiatric, social service, speech therapy, occupational therapy, and physical therapy consultations to assess his level of functioning. The hospital's "Patient Authorization and Consent" form states that "pt unable" to give consent and indicates an authorized representative signature was needed; it is undisputed that the hospital did not get such a signature from Gallagher. The space for a signature is blank. Gallagher opposed the hospital admission and assessments because she felt LaPlante's condition on June 25 was his baseline, an opinion shared by LaPlante's cardiologist of more than twenty-five years. 

 After the hospital admitted LaPlante, Gallagher repeatedly asked when he could leave, telling at least one doctor that "keeping [LaPlante] in the hospital was amounting to 'incarceration.'" The 

 Page 817 

doctor responded, "Call it whatever you want." Gallagher cooperated with the hospital's assessments of LaPlante [Note 19] but opposed its decision to administer a certain blood thinning medication because LaPlante already took a daily aspirin; they administered the medication anyway, and Gallagher testified at her deposition that it caused gastrointestinal bleeding. [Note 20]

 In the light most favorable to the plaintiff, Gallagher was not allowed to remove LaPlante from the hospital during this period. Gallagher admits that there were no locks on the doors or physical barriers preventing her or a patient from leaving. However, a "sitter" was stationed in LaPlante's room for his entire stay; the hospital contends the "sitter" was not authorized to prevent LaPlante's departure. Gallagher refers to the "sitter" as a "guard" and counters that the person's around-the-clock presence implied LaPlante was not permitted to leave. Gallagher also was told that LaPlante was not allowed out of bed. When Gallagher did take LaPlante from the room in a wheelchair, a hospital nurse screamed to "[g]et back in that room." While Gallagher herself could decide whether to stay or go, she testified she did not feel she reasonably could leave LaPlante because she considered the hospital's care of him to be "abusive, intrusive, and sub-par."

 "[B]efore the close of the day" on Friday, June 26, Schoener's supervisor instructed her "[t]hat if [LaPlante] was going to be discharged home, that [Schoener] was to seek a protective order." The next day, the hospital told Schoener "that they were going to discharge [LaPlante] home" because "there was no reason to keep him." Schoener expressed her intention to seek a protective order. Schoener then called the Weymouth police department and asked an officer (not Pompeo) to file a request for a protective order. A judge denied the police department's request within hours. Schoener told the hospital the order was not granted. While Schoener denies asking the hospital to keep LaPlante longer, there is no dispute that LaPlante was not discharged until two days later, on Monday, June 29. Gallagher testified that she was told by a physician that LaPlante was not permitted to leave on Saturday even though he was ready because Schoener had to visit him on Monday.

 Ultimately, it was determined that no medical condition had 

 Page 818 

required LaPlante's hospitalization. Gallagher contends that the hospital stay worsened LaPlante's condition in at least two ways. First, she contends that LaPlante's bedsore worsened after his stay in the hospital and eventually became septic, requiring a skin graft. She also testified that the hospital stay "deconditioned" LaPlante, whereas the day before the stay he had walked 280 feet at the gym.

 After LaPlante was discharged, Schoener was able to meet with him at the home. Ultimately, she did not substantiate the § 15 report and closed the investigation.

 Discussion. 1. Statutory framework. The Elder Abuse Reporting Law was enacted in 1982. See St. 1982, c. 604, § 1. The year before, a select committee of the United States House of Representatives on aging released "the first comprehensive analysis of the subject [it chose] to call elder abuse," in which it encouraged States to pass laws protecting the elderly. H.R. Rep. No. 97-277, 97th Cong., 1st Sess., at iii (1981) (Select Committee on Aging). [Note 21] As the report explained, "While it is not comfortable for Americans to admit that abuse of the elderly by their loved ones exists at any level, the facts cannot be ignored." Id. at 121.

 EOEA's procedures for investigating allegations of elder abuse are set forth at G. L. c. 19A, §§ 15-24, and 651 Code Mass. Regs. §§ 5.00. [Note 22] A § 15 report documents suspected "abuse," defined to include, among other things, an act or omission that "results in serious physical or emotional injury to" an elder. [Note 23] G. L. c. 19A, § 14. 651 Code Mass. Regs. § 5.02 (2004). A § 15 report is 

 Page 819 

immediately screened by the supervisor of an agency designated by EOEA, who determines the appropriate response. G. L. c. 19A, § 17. 651 Code Mass. Regs. §§ 5.04, 5.09 (1998). If the supervisor has reasonable cause to believe there is (1) an "emergency," which is "a situation in which an elderly person is living in conditions which present a substantial risk of death or immediate and serious physical or mental harm," G. L. c. 19A, § 14, [Note 24] or (2) a need for a "rapid response," defined as a "non-emergency, but urgent situation in which an [e]lder is living in conditions which present a potential, or developing risk of immediate and serious physical or emotional harm; or a potential or developing risk of immediate, substantial, and irrevocable financial loss," 651 Code Mass. Regs. § 5.02 (1998), the supervisor assigns the § 15 report for "immediate investigation," 651 Code Mass. Regs. § 5.09(2)(b) (1998). "Reasonable cause to believe" means "[a] basis for judgment that rests on specific facts . . . that supports a belief that a particular event probably took place or a particular condition probably exists." 651 Code Mass. Regs. § 5.02 (1998). Cases requiring a "routine response" are assigned for investigation "in a timely way, but no later than [forty-eight] hours from the time of intake." 651 Code Mass. Regs. § 5.09(2)(b) (1998).

 Caseworkers investigating reports designated for an emergency response have twenty-four hours to assess the needs of the elder and make a "determination of the need for an in home visit and/or other response." 651 Code Mass. Regs. § 5.10(2)(b) (1998). See G. L. c. 19A, § 18 (a). They then have five hours to initiate that response. 651 Code Mass. Regs. § 5.10(2)(b). Caseworkers assigned to conduct a rapid response have seventy-two hours to assess the elder's needs, and then twenty-four hours to initiate a response. 651 Code Mass. Regs. § 5.10(2)(c) (1998). For all other § 15 reports, the caseworker must make the first home or in-person visit "as soon as possible, but within five days of the receipt of the report." 651 Code Mass. Regs. § 5.10(2)(d) (1998). Elders are entitled to written notification that an investigation is being conducted. G. L. c. 19A, § 18 (a). 651 Code Mass. Regs. § 5.10(2)(e) (1998).

 A caseworker who is denied access to an elder and has "any information which indicates a safety risk to the [e]lder or the [c]aseworker" can "make a decision whether or not to request assistance from a law enforcement agency in visiting the [e]lder." 

 Page 820 

651 Code Mass. Regs. § 5.10(3) (2007). Agencies may also seek a protective court order for the purpose of investigating a § 15 report if they have "[r]easonable [c]ause to [b]elieve that access to the allegedly [a]bused [e]lder has been barred . . . or where the determination of the [e]lder's [c]apacity to [c]onsent is necessary for the completion of the [i]nvestigation." 651 Code Mass. Regs. § 5.17(1) (1998). Nothing in the statute or regulations authorizes entry into the home by a caseworker or accompanying police officer without consent, a warrant, a recognized exception to the constitutional requirement for a warrant to enter a home, or some other court order. [Note 25]

 While an investigation resulting in a finding of abuse leads to "a service plan for the provision of protective services," G. L. c. 19A, § 18 (a), the regulations emphasize that such services can be provided "only when" the elder consents, 651 Code Mass. Regs. § 5.15 (1998). See G. L. c. 19A, § 17 (2), (5). Caseworkers have a duty to "[i]nform the [e]lder of her/his rights regarding consent," and to "[r]espect the wishes of the [e]lder to the greatest extent feasible." 651 Code Mass. Regs. § 5.18(1)(a)(1), (1)(a)(4) (1998). Where consent is refused or withdrawn, services may "not be provided or continued except as provided in [G. L. c. 19A, § 20]." G. L. c. 19A, § 19 (a). 

 Section 20 provides a process for the department, its designated agency, a family member, or a caretaker to petition the court for an order of protective services when the elderly person lacks the capacity to consent. G. L. c. 19A, § 20. It requires the agency to seek court authorization before providing services to an elder who lacks capacity to consent, to an elder who does not consent, or to an elder who is suffering an emergency. See G. L. c. 19A, § 20 (a), (b); 651 Code Mass. Regs. § 5.15(5). Unless the court makes a "finding that immediate and reasonable [sic] foreseeable physical harm to the individual or others will result from the twenty-four hour delay," the elder is entitled to notice and an opportunity to be heard. G. L. c. 19A, § 20 (b). An elder subject to a § 20 petition has the right to counsel, to present evidence, and to examine and cross-examine witnesses; if the elder is indigent, the court shall appoint counsel. G. L. c. 19A, § 20 (a). "If the court determines that the elderly person lacks the capacity to 

 Page 821 

retain counsel or waive the right to counsel, the court shall appoint a guardian ad litem to represent the interests of such elderly person." Id. The procedures thus attempt to "balance individual autonomy with the mandate to provide protection." 651 Code Mass. Regs. § 5.01 (2004). Section 20 (b) provides an expedited process for seeking a protective order in an "emergency" situation.

 2. Entry into the home without consent or a warrant. Gallagher argues that Pompeo and Schoener's entry into her home was illegal. Both Pompeo and Schoener argue that their entry into the home was permissible on authority other than G. L. c. 19A. Because this question implicates more than one of the plaintiff's claims, we address it before turning to the plaintiff's specific causes of action.

 a. Exigent circumstances. Pompeo and Schoener both argue that exigent circumstances existed justifying the entry into the home.

 The United States Supreme Court has held that "law enforcement officers may enter private property without a warrant when certain exigent circumstances exist, including the need to 'render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" Caniglia v. Strom, 141 S. Ct. 1596, 1599 (2021), quoting Kentucky v. King, 563 U.S. 452, 460, 470 (2011). A police officer must "have an objectively reasonable basis to believe that there may be someone inside who is injured or in imminent danger of physical harm." [Note 26] Commonwealth v. Duncan, 467 Mass. 746, 749-750, cert. denied, 574 U.S. 891 (2014), quoting Commonwealth v. Peters, 453 Mass. 818, 819 (2009). See Commonwealth v. Snell, 428 Mass. 766, 774-775, cert. denied, 527 U.S. 1010 (1999). The exception applies to "a narrow category" of cases, Peters, supra, quoting Commonwealth v. Young, 382 Mass. 448, 456 (1981), where the injury sought to be avoided is "immediate and serious," Commonwealth v. Kirschner, 67 Mass. App. Ct. 836, 841 (2006). "[T]he mere existence of a potentially harmful circumstance is not sufficient." Id. at 841-842.

 Pompeo argues that the facts at bar are similar to the example of an elder welfare check that Justice Kavanaugh described in his 

 Page 822 

concurring opinion in Caniglia, 141 S. Ct. at 1605. In his example, "an elderly man is uncharacteristically absent from Sunday church services and repeatedly fails to answer his phone throughout the day and night. A concerned relative calls the police and asks the officers to perform a wellness check." Id. Justice Kavanaugh stated that "[o]f course," in those circumstances, the officers may enter the home. Id. Pompeo argues that she reasonably thought LaPlante was injured or in imminent danger on June 25 because no one responded to the doorbell, knocks, or telephone call, and because Gallagher had left LaPlante in the car with strangers two days earlier. On appeal, Schoener joins Pompeo's argument. The first judge concluded that there were exigent circumstances because Pompeo's belief was reasonable as a matter of law (the second judge did not address the issue). On this record, we disagree.

 The facts in this case are nothing like the hypothetical Justice Kavanaugh described. The implication of the hypothetical is that the elderly man lives alone. See id. LaPlante did not. Moreover, Gallagher and LaPlante were not out of touch or nonresponsive, as was the elder in Justice Kavanaugh's hypothetical. Pompeo and another elder care worker had seen LaPlante two days earlier, after his trip to the store and his time with strangers, and his appearance was not a cause for concern. Schoener had called the home on June 24, and Gallagher had her lawyer return the call that day. For a period of twenty minutes, neither Gallagher nor LaPlante responded to efforts to reach them. To the extent Pompeo and Schoener believed that LaPlante was alone in the home on June 25, the reasonableness of that belief was subject to dispute. Gallagher's car was in the driveway, and Pompeo believed she was home. In any event, the reasonableness of Pompeo's belief that LaPlante was "unattended," unresponsive, and suffering an emergency medical event on June 25 is grounded on what she claims to have seen through the door, a fact that, as we have said, is disputed. In addition, this Commonwealth has adopted procedures for addressing emergency care for an elder at risk of abuse or neglect, with substantial due process protections and protection from unwarranted entry and treatment without consent. See Caniglia, 141 S. Ct. at 1602 (Alito, J., concurring) (suggesting States should institute procedures for issuance of warrants for purposes of checking on person's medical condition).

 Further, even if Pompeo could see LaPlante on the couch, neither he nor Gallagher had any obligation to answer the door or 

 Page 823 

respond to the knock. "When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do. And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak." King, 563 U.S. at 469-470. A jury could find that Gallagher's lack of response to a knock on the door when she was not expecting visitors, and her absence from the room in which LaPlante was sleeping, did not give rise to a reasonable belief by Pompeo that LaPlante was unattended and suffering an emergency. [Note 27]

 Taking the evidence in the light most favorable to Gallagher and LaPlante, Pompeo and Schoener entered the plaintiff's home on June 25 without a warrant or reasonable belief that there were exigent circumstances and without providing notice or obtaining a court order as required by G. L. c. 19A.

 b. Community caretaking. Schoener argues that law enforcement officers have "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Commonwealth v. Evans, 436 Mass. 369, 372 (2002), quoting Cady v. Dombrowski, 413 U.S. 433, 441 (1973). Pompeo, recognizing that the United States Supreme Court held in 2021 that there is no "community caretaking" exception to the warrant requirement under the Fourth Amendment to the United States Constitution for entry into a home, Caniglia, 141 S. Ct. at 1599, [Note 28] attempts to draw other distinctions. [Note 29] Assuming, but not deciding, that law enforcement officers include elder care workers, Schoener's and Pompeo's arguments are unpersuasive. 

 As a matter of law, Schoener and Pompeo cannot rely on community caretaking functions to justify their warrantless entry 

 Page 824 

into the home when they were engaging in an investigation governed by G. L. c. 19A. Chapter 19A is a precisely drawn and specifically targeted statute that delineates the procedures to investigate a report of elder abuse or neglect, including the circumstances in which they may enter a home incident to such an investigation. Given this specific legislative direction, Schoener and Pompeo cannot bypass the procedures in c. 19A and rely on more general community caretaking functions, particularly when Massachusetts has never extended community caretaking functions to the home.

 Chapter 19A was designed to provide fundamental due process to elders, including incapacitated elders, and balance their right to self-determination and autonomy with the mandate to provide protection. Anything other than a straightforward application of the requirements of the statute would raise constitutional questions that we need not decide. To the extent that Pompeo was there to assist the elder care worker in the performance of her investigation, Pompeo's presence also failed to comply with G. L. c. 19A, § 20 (b), and the applicable regulations. 

 If Pompeo and Schoener thought the absence of a response to their knocks and telephone call on June 25 provided reasonable cause to believe LaPlante was in need of care (a proposition that we have previously observed was itself the subject of a factual dispute on the summary judgment record), they could have continued to observe the home while someone sought a court order to enter. G. L. c. 19A, § 20 (b). The same holds true if they thought that Gallagher was in some manner preventing access to LaPlante. See G. L. c. 19A, § 20 (a); 651 Code Mass. Regs. § 5.17(1) (1998). Instead, they acted in contravention of the statute and regulations by entering the home without consent or a court order, and without following the procedures outlined in G. L. c. 19A.

 In addition, on this summary judgment record, Gallagher offered proof sufficient to permit a reasonable trier of fact to conclude that no emergency existed, and therefore Pompeo and Schoener could not invoke the community caretaking function to allow a warrantless entry into the home. 

 Against this backdrop, we turn to the individual claims.

 3. Massachusetts Civil Rights Act. a. Threats, intimidation, or coercion. To establish a claim under the Massachusetts Civil Rights Act (MCRA or act), G. L. c. 12, §§ 11H-11I, "a plaintiff must prove that (1) the exercise or enjoyment of some constitutional or statutory right; (2) has been interfered with, or attempted 

 Page 825 

to be interfered with; and (3) such interference was by threats, intimidation, or coercion." Currier v. National Bd. of Med. Examiners, 462 Mass. 1, 12 (2012). On behalf of herself and LaPlante, Gallagher contends that Pompeo and Schoener violated the MCRA by violating their rights under art. 14 of the Massachusetts Declaration of Rights based on Pompeo and Schoener's "illegal entry into their home" and "illegal seizure" of LaPlante using threats, intimidation, or coercion. [Note 30] 

 As an initial matter, we note that the entry into the home, standing alone, cannot constitute a violation of the MCRA. To prevent the act from establishing a "vast constitutional tort," the Legislature has "explicitly limited the [act's] remedy to situations where the derogation of secured rights occurs by threats, intimidation or coercion" (citations omitted). Currier, 462 Mass. at 12, quoting Buster v. George W. Moore, Inc., 438 Mass. 635, 645-646 (2003). "'Threat' in this context involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm," while "'[i]ntimidation' involves putting in fear for the purpose of compelling or deterring conduct." Planned Parenthood League of Mass., Inc. v. Blake, 417 Mass. 467, 474, cert. denied, 513 U.S. 868 (1994) (Blake). "[C]oercion" is "the application to another of such force, either physical or moral, as to constrain [them] to do against [their] will something [they] would not otherwise have done" (citation omitted). Id. 

"Whether conduct constitutes coercion is examined from an objective, reasonable person standard." Currier, supra at 13. Even a direct deprivation of rights, like the entry into the home here, is not "actionable under the act unless it were accomplished by means of one of these three constraining elements." Buster, supra at 646.

 We turn then to the allegations that after Pompeo and Schoener saw that LaPlante was not unattended, they remained in the home over Gallagher's demands that they leave and caused the removal of LaPlante from the home without Gallagher's consent. Both Pompeo and Schoener argue that they did not engage in "threats, intimidation, or coercion" within the meaning of the MCRA. "Use of the disjunctive 'or' indicates that a plaintiff need establish only one of the three alternatives." Sarvis v. Boston Safe Deposit & Trust Co., 47 Mass. App. Ct. 86, 91 (1999).

 As we explained in Currier, however, "coercion may take 

 Page 826 

various forms, and [the case law] ha[s] not limited its scope to actual or attempted physical force." Currier, 462 Mass. at 12-13, quoting Buster, 438 Mass. at 646-647. "[O]vertly menacing behavior" is not required. Reproductive Rights Network v. President of the Univ. of Mass., 45 Mass. App. Ct. 495, 508 (1998). Rather, "[i]t is 'the active domination of another's will'" that brings conduct within the scope of the act. Buster, supra at 646, quoting Blake, 417 Mass. at 474. Intimidation or coercion can be found based on an implied threat of arrest or removal by a security guard, see Batchelder v. Allied Stores Corp., 393 Mass. 819, 823 (1985), where protesters physically block people from exercising their rights, see Blake, supra at 474-475, or where a university uses uniformed campus police officers to prohibit, under threat of arrest for trespass, student access to a campus building for the purpose of engaging in protected political activity, see Reproductive Rights Network, supra at 507-508.

 Here, viewing the facts in the light most favorable to the plaintiff, a uniformed police officer (Pompeo) and a State elder care worker (Schoener) entered the plaintiff's home without (1) permission, (2) a warrant, or (3) a reasonable belief that there were exigent circumstances, and without following the procedures set forth in G. L. c. 19A. Then, after seeing that LaPlante was asleep and not unattended as they feared, they refused to leave when told to do so. Without providing any information about the process under G. L. c. 19A, they ordered Gallagher to come downstairs, to produce LaPlante's health care proxy and power of attorney, and to sit down. They also told Gallagher that it would go easier if she talked, even though they knew Gallagher's lawyer had told Gallagher she did not have to speak to them. Pompeo then called her supervisor and EMTs to the home without Gallagher's consent. Pompeo asked the EMTs whether they "could get" Gallagher (presumably for elder abuse) if LaPlante was dehydrated. Both Pompeo and Schoener supported LaPlante's removal by EMTs, and he was removed without Gallagher's consent and, indeed, over her objection (the other officer, Pompeo's supervisor, had to order Gallagher to move several times to allow the EMTS to remove LaPlante from the home). Schoener claimed not to know whether the health care proxy was invoked even though she also thought LaPlante's apparent inability to communicate justified an ambulance, but by statute the proxy was presumptively valid. G. L. c. 201D, § 2. Thus, there is (at least) a genuine dispute whether Pompeo and 

 Page 827 

Schoener interfered with Gallagher's and LaPlante's rights by intimidation or coercion.

 Pompeo misses the mark when she contends that Gallagher was not coerced because she asked Pompeo and Schoener to leave and did not prevent the EMTs from removing LaPlante. On this record, a reasonable jury could find that Gallagher tried to protect the sanctity of her home and LaPlante's bodily integrity but her will was overcome by Pompeo's and Schoener's presence and control of the scene and by their causing LaPlante's removal without Gallagher's consent. 

 Finally, in addition to proceeding in her individual capacity, Gallagher may also proceed with this claim in her capacity as LaPlante's agent and health care proxy. We do not agree with the conclusion of both motion judges that LaPlante's MCRA claims failed as a matter of law because there was no evidence he was aware of what was happening and therefore could not have been put in fear or constrained to do something against his will. [Note 31] Gallagher's will was LaPlante's will. "All acts done by an attorney in fact pursuant to a durable power of attorney during any period of disability or incapacity of the principal have the same effect and inure to the benefit of and bind the principal and his successors in interest as if the principal were competent and not disabled." G. L. c. 190B, § 5-502. Also, execution of a health care proxy "enables an individual to designate in advance a person he or she trusts to provide such informed consent when the individual is no longer able to do so." Johnson v. Kindred Healthcare, Inc., 466 Mass. 779, 783 (2014). See G. L. c. 201D, § 2. Once a proxy is invoked, the agent stands in the shoes of the principal when it comes to "any and all" decisions affecting the principal's bodily integrity, G. L. c. 201D, § 5, because the agent is required to make decisions "'from the principal's perspective,' in accordance with the principal's wishes, if known, or best interests, if not." Johnson, supra, quoting Cohen v. Bolduc, 435 Mass. 608, 618 (2002). To the extent there is a question whether Gallagher's MCRA claim in her capacity as LaPlante's agent and health care proxy belongs to the principal or the agent, the parties have not briefed the issue, and we decline to address it.

 b. Qualified immunity on the MCRA claim. The first judge did not address Pompeo's argument that she was protected by qualified 

 Page 828 

immunity on the MCRA claim. We assume without deciding that Pompeo sufficiently raised the defense of qualified immunity on appeal when in her brief she compared the facts in this case to Hill v. Walsh, 884 F.3d 16 (1st Cir. 2018), which concerns qualified immunity. [Note 32] 

 "Public officials have the same protection for violations of the Massachusetts Civil Rights Act, G. L. c. 12, § 11I, as they have under Federal law for violations of 42 U.S.C. § 1983." Ortiz v. Morris, 97 Mass. App. Ct. 358, 362 (2020), citing Duarte v. Healy, 405 Mass. 43, 46 (1989). "Under § 1983, officers performing discretionary functions 'generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Ortiz, supra, quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). 

 "Courts resolving qualified immunity claims at summary judgment perform a two-step inquiry, asking whether the facts adduced by the plaintiff 'make out a violation of a constitutional right' and, if so, whether that right was 'clearly established' at the time of [the] defendant's alleged misconduct.'" Earielo v. Carlo, 98 Mass. App. Ct. 110, 115 (2020), quoting Pearson v. Callahan, 555 U.S. 223, 232 (2009). If the answer is negative for either prong, the defendant official enjoys qualified immunity. Earielo, supra. 

 Again, viewing the evidence in the light most favorable to Gallagher, see White v. Gurnon, 67 Mass. App. Ct. 622, 627-628 (2006) (summary judgment record viewed in light most favorable to plaintiffs on qualified immunity claim), Gallagher offered proof sufficient to permit a reasonable trier of fact to conclude that Pompeo violated Gallagher's Fourth Amendment rights by entering her home without a warrant or consent and that Pompeo did not have a reasonable belief of an emergency. See Commonwealth v. King, 67 Mass. App. Ct. 823, 826 (2006) ("It is well-established that warrantless searches . . . are presumptively unreasonable under both the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights"). See also Duncan, 467 Mass. at 749-750 (describing "'narrow category' of cases where an exception to the warrant requirement is justified").

 Page 829 

 "The second prong of the analysis requires a showing that, to overcome immunity, it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. . . . The objective legal reasonableness of the defendant's actions is a question of law for the courts." (Citation and quotation omitted.) Earielo, 98 Mass. App. Ct. at 115. We conclude that the law of entry into the home based on exigent circumstances was clearly established for purposes of qualified immunity and that genuine issues of material fact exist regarding the alleged violation of the plaintiff's constitutional rights, so as to preclude summary judgment.

 Similarly, on this summary judgment record, Gallagher offered proof sufficient to permit a reasonable trier of fact to conclude that no emergency existed and therefore Pompeo and Schoener could not invoke the community caretaking function to allow a warrantless entry into the home. As to the second prong, Massachusetts law was settled in June 2015 as to what Pompeo was supposed to do under these circumstances, given that G. L. c. 19A, § 20 (b), instructs officials to seek out a court order when there is reasonable cause to believe an elder is in need of emergency care. As the Supreme Judicial Court noted in Pasqualone v. Gately, 422 Mass. 398, 404 (1996), as to qualified immunity, there cannot have been a reasonable belief that a police officer's "action was taken lawfully because it contradicts the explicit statutory scheme."

 Thus, on this summary judgment record, Pompeo is not entitled to qualified immunity on the MCRA claim.

 4. Trespass. "[A] trespasser 'is a person who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise.'" Massachusetts Port Auth. v. Turo Inc., 487 Mass. 235, 244-245 (2021), quoting Restatement (Second) of Torts § 329 (1965). To support an action for trespass "it is necessary to prove the . . . possession of the plaintiff, and an illegal entry by the defendant." New England Box Co. v. C & R Constr. Co., 313 Mass. 696, 707 (1943).

 There is no dispute that Pompeo and Schoener entered and remained in Gallagher's home without permission and after her repeated demands that they leave. Pompeo argues, and the first judge agreed, that Pompeo was privileged to enter under § 197 of the Restatement (Second) of Torts (1965), which provides that "[o]ne is privileged to enter or remain on land in the possession of another if it is or reasonably appears to be necessary to prevent 

 Page 830 

serious harm to . . . a third person . . . unless the actor knows or has reason to know that the one for whose benefit he enters is unwilling that he shall take such action." [Note 33] The first judge reasoned that Pompeo believed her actions were necessary to prevent serious harm to LaPlante and that belief was reasonable as a matter of law. [Note 34] Without deciding whether § 197 of the Restatement (Second) of Torts would be adopted in this Commonwealth, the comment to the section states that the privilege in this section only exists where in an emergency an actor enters land for purposes of protecting herself, the land possessor, or a third party. Restatement (Second) of Torts § 197 comment a. We have already outlined the reasons a jury could decline to credit Pompeo's belief that her actions were necessary to protect LaPlante from imminent harm or could question whether LaPlante might have been unwilling to permit Pompeo to take the action she did. Accordingly, there is a dispute whether the privilege would apply. [Note 35]

 The second judge did not reach the question of privilege after 

 Page 831 

concluding Gallagher could not show injury, citing to the Superior Court's model jury instructions on trespass as requiring proof of injury. [Note 36] This was error. The injury portion of the model instruction was not supported by citation to any authority, and is "not dispositive of the issue." Tedeschi-Freij v. Percy Law Group, P.C., 99 Mass. App. Ct. 772, 778 & n.9 (2021).

 It has long been the "general rule" in this Commonwealth that "possession of real estate is sufficient to enable the parties in possession to maintain an action against a stranger for interfering with that possession." New England Box Co., 313 Mass. at 707. Proof of injury is not required; "the action is founded merely on the possession." Id. See Meagher v. Driscoll, 99 Mass. 281, 285 (1868) ("The gist of the action is the breaking and entering of the plaintiff's close"). See also Sheppard Envelope Co. v. Arcade Malleable Iron Co., 335 Mass. 180, 188-189 (1956) (fact that plaintiff suffered little or no damage on account of trespass no bar to granting relief); Blood v. Cohen, 330 Mass. 385, 387 (1953) (that trespass "did not harm the property is not controlling"); Appleton v. Fullerton, 1 Gray 186, 194 (1854) (plaintiff who sustained no damage from trespass still "entitled to maintain the action"). Cf. Tedeschi-Freij, 99 Mass. App. Ct. at 778 (proper to vindicate rights under G. L. c. 214, § 3A, even if plaintiff cannot prove actual damages because "appropriation of a likeness or name is 'in the nature of a usurpation of a plaintiff's property rights'" [citation omitted]). Of course, while a plaintiff may pursue a cause of action for trespass without proof of injury, the plaintiff is permitted to attempt to prove injury arising from the trespass.

 Given the disputes of fact, and the absence of injury as an element of a claim for trespass, summary judgment should not have entered on the trespass claim.

 5. False imprisonment. a. Pompeo and Schoener. Gallagher brought a claim for false imprisonment against Pompeo and Schoener/ESSC on behalf of LaPlante. To establish a claim for false imprisonment, a plaintiff must show that the defendant "impos[ed] by force or threats an unlawful restraint upon freedom 

 Page 832 

of movement." Wax v. McGrath, 255 Mass. 340, 342 (1926). See Ortiz v. County of Hampden, 16 Mass. App. Ct. 138, 140 (1983), citing Restatement (Second) of Torts § 35 (1963-1964 & Supp. 1982) ("false imprisonment requires unlawful confinement by force or threat"). "If a [person] is restrained of [their] personal liberty by fear of a personal difficulty, that amounts to a false imprisonment within the legal meaning of such term" (citation omitted). Coblyn v. Kennedy's, Inc., 359 Mass. 319, 321 (1971). "[A] plaintiff who relinquishes [the] right to move about freely as the only available alternative to relinquishment of another right, such as the right to an unsullied reputation, is restrained, or imprisoned, in the sense that imprisonment is an element of tortious false imprisonment." Foley v. Polaroid Corp., 400 Mass. 82, 91 (1987).

 Pompeo and Schoener argue that they cannot be liable for false imprisonment because they did not play a role in the hospital's decision to hold LaPlante for five days. As an initial matter, we note that on the basis of the summary judgment record, a jury could find Pompeo and Schoener liable for false imprisonment for their actions within Gallagher's home. As with the MCRA claim, while LaPlante did not awaken until he was in the hospital, Gallagher was his proxy and was present and aware of what was happening in the home. A jury could find that she and LaPlante were confined unlawfully. In addition, a person can be liable for false imprisonment carried out by third parties if they engage in conduct that sets in motion a false imprisonment knowing that there was no lawful basis for the imprisonment. See Karjavainen v. Buswell, 289 Mass. 419, 427 (1935), questioned on other grounds by Mezullo v. Maletz, 331 Mass. 233, 239-240 (1954) (if jury found that defendant, in collusion with his butler, caused physician by false statements to request commitment of plaintiff to State hospital, and consequently she was received and detained there, defendant would be liable to plaintiff in damages for false imprisonment); Sarvis, 47 Mass. App. Ct. at 97-98 (defendants, by requesting that plaintiffs be arrested for trespassing if seen on property, knowing there was no lawful basis for that request, liable for plaintiffs' consequential confinement). See also Restatement (Second) of Torts § 37 ("If an act is done with the intent to confine another, and such act is the legal cause of confinement to another, it is immaterial whether the act directly or indirectly causes the confinement").

 On this record, a jury could find that Pompeo and Schoener intentionally and wrongfully caused LaPlante to be confined 

 Page 833 

within the home, the ambulance, and the hospital. Pompeo and Schoener entered LaPlante's home without permission or, a jury could find, legal justification; refused to leave despite seeing he was not unattended and learning there was a health care proxy naming Gallagher as LaPlante's agent; and instead called an additional officer to the home for the purpose of preventing Gallagher, LaPlante's agent, from interfering with the EMTs -- whom Gallagher had not invited -- while LaPlante was removed via an ambulance and transported without her to the emergency room. There, on the hospital's request, Pompeo removed Gallagher after she objected to the use of a catheter that she believed would hurt him. LaPlante awoke and became combative, suggesting he was in fact subjected to distress upon becoming aware of his confinement at the hospital, contrary to the first and second judges' views. In addition, a rational jury could infer that Schoener caused the extension of the stay from Saturday to Monday, making her directly responsible for at least that portion of the hold in the hospital, separate and apart from the initial transport and admission.

 b. The hospital. The hospital admitted LaPlante without his consent or the consent of his health care proxy and retained him even after Gallagher objected to at least one doctor that this "was amounting to 'incarceration.'" It then held LaPlante for days under the watch of a "sitter" after telling Gallagher that LaPlante was not allowed out of bed, a point reinforced when a nurse yelled at her for wheeling him into the hall. Two of LaPlante's days at the hospital occurred after the hospital told Schoener that LaPlante was going to be discharged and Schoener told the hospital she would be seeking a court order to prevent that from happening. While there is a dispute whether Schoener asked the hospital to continue holding LaPlante, there is no dispute that he was not discharged until Monday. Thus, a jury could find that the hospital falsely imprisoned LaPlante for some or all of the stay.

 The first and second judges held that Gallagher could not prevail as a matter of law because there was no evidence LaPlante was harmed by the confinements. This was error. It is enough if a person's personal liberty is restrained. Coblyn, 359 Mass. at 321. Moreover, Gallagher does contend that LaPlante was harmed by the hospitalization - that his bed sore worsened and that his ability to walk was diminished. To the extent that LaPlante was not aware of his confinement, Gallagher, his proxy, was.

 The hospital contends that it cannot be liable for false imprisonment (or battery) because it was privileged to treat LaPlante, 

 Page 834 

citing the Federal Emergency Medical Treatment and Active Labor Act. Neither the act nor the Federal regulations cited by the hospital support a conclusion that the hospital is entitled to judgment as a matter of law on the claim for false imprisonment (or battery). 

 The Federal Emergency Medical Treatment and Active Labor Act requires "appropriate medical screening" of people who arrive in a hospital emergency room to determine whether "an emergency medical condition . . . exists." 42 U.S.C. § 1395dd(a). But the hospital does not claim that there was an emergency, or that time and circumstances prevented it from obtaining Gallagher's consent before commencing treatment. Such a showing is "an essential aspect of the emergency exception to the requirement that a physician obtain a patient's informed consent before proceeding with treatment." Shine v. Vega, 429 Mass. 456, 466 (1999). The provisions of the Code of Federal Regulations to which the hospital points relate to discharge planning and not the decision to admit a patient, see 42 C.F.R. § 482.43, while G. L. c. 111, § 70E, outlines patients' rights once they have already been admitted. None of the authorities [Note 37] cited by the hospital concerns the admission of a patient without the patient's consent when there is no emergency.

 6. Battery. A battery is an intentional touching "that was offensive to the victim," meaning without consent. Commonwealth v. Cohen, 55 Mass. App. Ct. 358, 359 (2002). 

 There is no dispute that hospital personnel touched LaPlante while examining him in the emergency room and during the course of his five-day admission. The health care proxy statute permits such invasions "only with the principal's informed consent, which will be given or denied by the agent whom the principal has appointed to make such decisions consistent with the principal's wishes and belief system." Johnson, 466 Mass. at 787-788. Health care providers, in turn, "shall comply with health care decisions made by an agent under a health care proxy to the same extent as if such decisions have been made by the principal, subject to any limitations in the health care proxy, or in any specific court order." G. L. c. 201D, § 5. "Health care" includes "any treatment, service or procedure to diagnose or treat the physical or mental condition of a patient." G. L. c. 201D, § 1. By 

 Page 835 

requiring court approval to override a "[h]ealth care decision made by an agent under a health care proxy," id., see G. L. c. 201D, § 17, the health care proxy statute "ensures that a patient's right of autonomy and self-determination with regard to medical care is respected, even after she loses the capacity to make and communicate her wishes." Cohen, 435 Mass. at 618.

 For LaPlante, that health care proxy was Gallagher. Whatever the hospital may have thought of that choice, Gallagher alone had the power to consent to or refuse treatment of LaPlante. See Matter of Spring, 380 Mass. 629, 634 (1980). The hospital knew the health care proxy was invoked once the emergency room doctor spoke to LaPlante's PCP, but did not obtain Gallagher's consent before drawing LaPlante's blood and urine, conducting other assessments, or admitting him. Medical staff may genuinely have believed they were acting in LaPlante's best interests, but that "is not the touchstone of a substituted judgment decision." Shine, 429 Mass. at 461 n.11. "[I]t is the prerogative of the patient, not the physician, to determine . . . the direction in which . . . his interests lie" (citation omitted). Harnish, 387 Mass. at 154. LaPlante's health care proxy did not limit Gallagher's authority to making medical decisions with which doctors agreed. "[I]f the patient's right to informed consent is to have any meaning at all, it must be accorded respect even when it conflicts with the advice of the doctor or the values of the medical profession as a whole" (citation omitted). Shine, 429 Mass. at 464 n.14.

 On this record, it would be "reasonable and possible," Commonwealth v. Evans, 439 Mass. 184, 200 (2003), for a jury to conclude that the hospital's actions constituted a battery because they were undertaken without consent, which is all that is required to defeat summary judgment. 

 Conclusion. The separate and final judgment in favor of Pompeo, and the judgment in favor of Schoener, ESCC, and the hospital dismissing the amended complaint, both dated March 11, 2020, are reversed, and the case is remanded for further proceedings. [Note 38]

 So ordered.

FOOTNOTES
[Note 1] Individually and as personal representative of the estate of Philip LaPlante. 

[Note 2] Jennifer Pompeo, Eileen Schoener, and Elder Services of Cape Cod and the Islands, Inc. 

[Note 3] As is our custom, we refer to the parties by their last names. 

[Note 4] Gallagher's individual claim in count four was dismissed on the hospital's motion. She did not appeal from that dismissal. 

[Note 5] Pompeo also filed a third-party complaint against Fallon Ambulance that was dismissed by the first judge in a separate and final judgment from which no appeal was taken. Fallon has not taken a position in this appeal. 

[Note 6] While we set out the facts in the light most favorable to Gallagher as the nonmoving party, we also note some factual disputes for coherency. When there is a dispute of fact, we must accept Gallagher's version for purposes of summary judgment. Lev, 457 Mass. at 237. While a jury may credit Gallagher's version of events, they are not required to do so. A jury may ultimately credit Pompeo's and Schoener's version of events or may find that the truth lies somewhere in between. 

[Note 7] Elder Outreach Services Weymouth is not part of South Shore Elder Services, the agency designated by EOEA to provide protective services for the elderly in Weymouth. See G. L. c. 19A, § 16 (b), (c); Winfield v. Elder Servs. of Merrimack Valley, Inc., 456 Mass. 1015, 1015 n.2 (2010). 

[Note 8] Gallagher contends that the person with Pompeo identified herself as Christine Quinn. This dispute over the name is immaterial for purposes of our review. 

[Note 9] Bessette and Gallagher were strangers to one another. Perhaps if Bessette had agreed to assist Gallagher by sitting with LaPlante for an hour while Gallagher did grocery shopping, she could have accomplished her investigatory purpose --- allowing her to speak with LaPlante alone -- and we might not have a case at all. Pasqualone v. Gately, 422 Mass. 398, 401 (1996) (if officer had asked gun owner to voluntarily turn over his weapons after his license was revoked rather than demand them with considerable show of force, we might have a different case). 

[Note 10] In August 2014, Pompeo took a report from Gallagher alleging that LaPlante's church and "different Boston hospitals" abused and neglected LaPlante in 2006. Although another officer accompanied Pompeo to take the report, Gallagher would not allow the other officer to enter, citing her "'constitutional right' to decide who entered her home." After this visit, Pompeo "filed with South Shore Elder Services" a § 15 report, and "did a welfare check" on LaPlante the next month. Pompeo also assisted Old Colony Elder Services in visiting the home "on another date in 2014," because, Pompeo claimed, "they did not want to come to this location without police because of Ms. Gallagher's aggressive and condescending personality." Old Colony Elder Services is designated by EOEA to cover Brockton. 

[Note 11] Gallagher held a different view, believing that it is her charity to embrace people, that many people in this community have a criminal record, and that, after one has confessed one's sins, one is absolved. In any event, while Pompeo spoke to Gallagher using terms such as "warrants" and "arraignments," Gallagher testified that she did not know what "warrant" means and "it's the government's problem for letting [someone with an outstanding warrant] walk the streets." Of course, an arraignment is not a conviction. See Commonwealth v. Donati, 373 Mass. 769, 771 (1977). 

[Note 12] ESCC is designated by EOEA to cover Cape Cod and the islands. 

[Note 13] That Gallagher was on the second floor and may not have heard knocking does not create a dispute as to whether Pompeo knocked. Similarly, the fact that the doorbell was broken does not mean Pompeo did not use it. 

[Note 14] Gallagher elaborated that two floor-to-ceiling closets flanked the entry area and blocked the view of the living room. She submitted a photograph in opposition to the motion for summary judgment by Schoener and ESCC, from a vantage point inside the unit, to "show that they could not have seen around an entry closet and hall to the couch that was in the living room." The record does not include a picture from the point of view of the front step. 

[Note 15] Schoener testified that her agency does not have introductory documentation to give a caregiver such as Gallagher. 

[Note 16] We infer the plus sign means "positive" or the presence of skin tenting. 

[Note 17] Gallagher explained, "If I could have had him washed and dressed before anyone came into my house . . . anything soiled, that would have definitely been cleaned up by me." The absence of an incontinence product would not automatically equate to abuse or neglect. 

[Note 18] The hospital stated in response to an interrogatory that, "[t]o the best of our knowledge, Fr. LaPlante was not catheterized," but there is no dispute that LaPlante's urine somehow was obtained before being tested. 

[Note 19] Gallagher did not object to the collection of urine and blood samples between June 25 and 29. 

[Note 20] Gallagher also opposed the use of psychotropic medications to address LaPlante's combativeness; she did not know whether psychotropics were administered, and the record does not address the question. 

[Note 21] The report is available at https://www.ojp.gov/pdffiles1/Digitization/77973NCJRS.pdf [https://perma.cc/TTU6-PXL6]. 

[Note 22] We cite to the procedures that were in effect in June 2015. In 2017, the regulations were reorganized and amended to provide more expansive definitions, and to make changes to the requirements for documentation of case records. See 651 Code Mass. Regs. §§ 5.01-5.26 (2017). Substantively, though, they are largely the same. Subsequent changes were also made to the statute, but none are pertinent to this dispute. 

[Note 23] The full definition of "abuse" is "an [a]ct or omission which results in serious physical or emotional injury to an elderly person or financial exploitation of an elderly person; or the failure, inability or resistance of an elderly person to provide for him one or more of the necessities essential for physical and emotional well-being without which the elderly person would be unable to safely remain in the community; provided, however, that no person shall be considered to be abused or neglected for the sole reason that such person is being furnished or relies upon treatment in accordance with the tenets and teachings of a church or religious denomination by a duly accredited practitioner thereof." G. L. c. 19A, § 14. 

[Note 24] See 651 Code Mass. Regs. § 5.02 (1993). 

[Note 25] Schoener argued to the second motion judge that her actions were "explicitly authorized by statute" because G. L. c. 19A "granted blanket authorization to perform all functions determined by [EOEA] to be necessary to comply with the spirit of the law." She does not advance this argument on appeal. 

[Note 26] "'[W]hether an exigency existed' is a matter 'to be evaluated in relation to the scene as it could appear to the officer[] at the time, not as the scene might appear in hindsight." Commonwealth v. Arias, 481 Mass. 604, 616 (2019), quoting Commonwealth v. Young, 382 Mass. 448, 456 (1981). 

[Note 27] Were it otherwise, no caretaker for the elderly or parent of a small child could ever sleep, use the bathroom, change the laundry, or simply decline to answer a knock at the door without risking warrantless entry by a government official. 

[Note 28] Accordingly, there cannot be a community caretaking exception permitting entry into the home under art. 14 of the Massachusetts Declaration of Rights. Commonwealth v. DeJesus, 489 Mass. 292, 296 (2022) ("Massachusetts Constitution may not provide less protection to defendants than the Federal Constitution"). 

[Note 29] Pompeo claims that we should review her conduct based on the law as it existed at the time of the events in this case. In light of our disposition, we need not decide whether Caniglia applies retroactively. 

[Note 30] We do not understand Gallagher to be claiming that Pompeo's act of filing a report was a violation of Gallagher's rights. Nor do we understand Gallagher's MCRA claim to allege a violation of a statute. 

[Note 31] A rational jury also could find that because the EMTs said that LaPlante "becomes" combative, he did have some awareness of their touching him in the home. 

[Note 32] Pompeo did not raise the defense of qualified immunity in response to any other claim. 

[Note 33] The first judge and Pompeo cited to "§ 17" of the Restatement (Second) of Torts, which we take to be typographical errors, because the quotation is from § 197. Section 17 was an unrelated section, later omitted from the Restatement. 

[Note 34] The first judge also cited Thurlow v. Crossman, 336 Mass. 248, 251 (1957), which stated that "[a] police officer who enters upon private premises in good faith in the performance of his official duty to protect life and property and to preserve the peace is not a trespasser." As indicated, however, there is a factual dispute about whether the entry was necessary to protect life. We also note that the statutes at issue in Thurlow and its progeny, Commonwealth v. Colella, 360 Mass. 144, 147-148 (1971); Carlisle v. Department of Pub. Utils., 353 Mass. 722, 723 (1968); and Commonwealth v. Murphy, 353 Mass. 433, 437 (1968), specifically authorized natural resource officers and gas pipeline companies to enter private land in furtherance of their statutory duties and said nothing about entering a home. Thurlow did not authorize entry into a home. Moreover, the Supreme Judicial Court subsequently held that, as a matter of policy, law enforcement officers, "in making inspections or entries upon land (particularly land on which there is a dwelling), [should] obtain a search warrant at least where no emergency situation makes that impossible or inappropriate." Colella, supra at 150. Finally, no such provision permitting entry upon land of another appears in G. L. c. 19A or its accompanying regulations. Compare G. L. c. 21, § 6D (at issue in Colella, supra, and since repealed); G. L. c. 164, § 75D (at issue in Carlisle, supra). Schoener and ESCC also argue that authority to enter the home could be implied from statutes authorizing the removal of children in "immediate danger from abuse or neglect." See G. L. c. 119, § 51B (c); 110 Code Mass. Regs. § 4.29 (2009). Given the procedures established by G. L. c. 19A, no such authority can be implied. 

[Note 35] We need not consider whether Massachusetts would adopt the Restatement (Second) of Torts § 211, which addresses entry on land in the possession of another to perform a legislative duty or authority. That section applies "if, but only if, all the requirements of the enactment are fulfilled." 

[Note 36] The second judge cited the 2018 version of the instructions, which would not apply to events in 2015. In any event, the version of the model instructions in effect in 2015 also identified injury as an element of trespass, see Massachusetts Superior Court Civil Practice Jury Instructions § 24.4 (Mass. Cont. Legal Educ. 3d ed. 2014). 

[Note 37] To the extent the hospital relies on a regulation promulgated by an accrediting agency, it does not appear to have been entered in the record below and, in any event, was not effective at the time of LaPlante's hospitalization. 

[Note 38] The requests by Schoener, ESCC, and the hospital for attorney's fees and costs are denied. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.